UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

16 SEP 27  AM 11: 32

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| PAUL GILBERT DEVOE, III,<br>TDCJ No. 999550,<br><br>Petitioner,<br><br>V.<br><br>LORIE DAVIS, Director,[1]<br>Texas Department of Criminal Justice,<br>Correctional Institutions Division,<br><br>Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL NO. A-14-CA-151-SS |

## MEMORANDUM OPINION AND ORDER

Petitioner Paul Gilbert Devoe, III filed this action pursuant to 28 U.S.C. § 2254 challenging his October 2009 conviction for capital murder and sentence of death in Travis County Cause No. D-1-DC-07-302093. For the reasons discussed below, Petitioner is entitled to neither federal habeas corpus relief nor a certificate of appealability from this Court.

### I. Background and Procedural History

A.    Indictment

On November 19, 2007, a Travis County grand jury indicted Petitioner on a charge of capital murder, to wit, intentionally and knowingly causing the death of Haylie Faulkner by shooting Haylie with a firearm and intentionally and knowingly causing the death of Danielle

---

[1] Lorie Davis, the current Director of the Texas Department of Criminal Justice – Correctional Institutions Division, is substituted as the respondent in this case.

Hensley by shooting Danielle with a firearm and committing both murders during the same

criminal transaction.[2]

B.      Guilt-Innocence Phase of Trial

The guilt-innocence phase of Petitioner's capital murder trial commenced on September

8, 2009.[3]  The Texas Court of Criminal Appeals' opinion affirming Petitioner's conviction and

sentence on direct appeal accurately summarized the testimony and other evidence presented

during the guilt-innocence phase of Petitioner's trial as follows:

> The evidence presented at guilt revealed that, in late August 2007,
> Appellant stole a silver Jennings .380–caliber handgun ("the gun"), two
> ammunition magazines, and fifteen Winchester bullets from his friend, Bill
> Brinlee. Brinlee considered Appellant to be "family," as Appellant had previously
> lived with the Brinlees.  Appellant had access to the house, knew that the Brinlee
> would be out of town for a wedding during the weekend of August 24, and was
> aware that the gun was kept in the master bedroom.
> On August 24, 2007, Appellant was residing at the Llano home of Sharon
> Wilson in exchange for work he had agreed to do around her home.  At about
> 3:00 p.m., Wilson came home to find Appellant outside with the gun.  Wilson had
> previously informed Appellant that she did not allow firearms in her home, and
> she asked that he not bring it in the house.  She assumed that Appellant complied
> with her request.
> A short while later, Wilson found Appellant looking in her purse.  He
> claimed to be looking for a cigarette.  Appellant then went to take a nap.  At this
> point, Wilson decided that it was time to ask Appellant to vacate her home.  She
> called some friends to be with her when she told him because she was afraid of
> how Appellant might react to the request.  While waiting for her friends, she
> discovered that Appellant had emptied the gas can that she had filled for her lawn

---

[2]  The Records from Petitioner's state trial court, state direct appeal, and state habeas corpus proceedings
were submitted by Respondent on a diskette.  The records from Petitioner's state trial court proceedings including
the pleadings, motions, and other documents filed in Petitioner's state trial court proceedings are filed under
"Clerk's Record" (henceforth "CR").  Petitioner's indictment appears at CR, Vol. 1, at pp. 29-30.

[3]  The verbatim transcription from the guilt-innocence phase of Petitioner's capital murder trial also appears
on the same diskette as the pleadings and other documents filed in Petitioner's state trial court proceeding as
"Reporter's Record" (henceforth "RR").  RR Volumes 21 through 25 are the verbatim transcription of the entire
guilt-innocence phase of Petitioner's trial.  RR Volumes 26 through 29 are the verbatim transcription of the
punishment phase of Petitioner's trial.

mower.  Angered, Wilson felt she could wait no longer, so she went to confront Appellant.

Upon finding Appellant asleep in her bedroom, Wilson woke him and told him that he needed to leave.  Appellant got up and went directly to the living room couch where he retrieved the gun from a hiding place behind the cushions, and he pointed it at Wilson's head and mid-section.  Wilson knocked Appellant's arm so that the gun pointed away from her.  Appellant then fired the gun multiple times into the couch and walls.  Appellant spoke of killing himself.  He told Wilson that he had only two bullets left and that he was going to his trailer, which was parked nearby, to get more.  Appellant advised Wilson not to go near her pickup truck, but he told her she could go outside to smoke a cigarette.  When Appellant walked out the door, Wilson grabbed her dog and ran from her home.  She hid in heavy vegetation and cactus in the adjoining field.  She heard Appellant start a truck, and he drove it towards Wilson.  He stopped and revved the engine several times before backing up.  Wilson saw Appellant drive away in her blue Dodge Dakota pickup truck.  The license plate number was 21X–ZJ5.  Wilson later found that her money and credit cards were missing from her purse.  Investigators recovered .380–caliber bullets and shell casings from her home, and Wilson turned over Appellant's day planner, which contained a photocopy of Paula Griffith's driver's license.

Later that evening, Glenda Purcell was at her usual hangout, O'Neill's Sports Tavern in Marble Falls.  Purcell had recently broken up with Appellant after a tumultuous six-month romantic relationship that ended when she asked him to move out of her home.  Following the break-up, Purcell obtained a protective order against Appellant, of which Appellant had notice. Michael Allred was on duty as a bartender that night.

At approximately 8:30 p.m., Appellant entered O'Neill's Sports Tavern.  He was dressed in what Purcell described as his "motorcycle attire": a black leather vest, chaps, a cap, and a jacket.  Purcell immediately called out for someone to call the police because she had a protective order against Appellant.  Appellant then walked over to Purcell, put his hand over her eyes, and held the gun to her head.  He pulled the trigger several times, but the gun jammed.  Purcell then ran back towards the men's room where Allred was repairing something.  She yelled, "Mike, Mike, [Appellant's] here, he's got a gun."  Allred stepped between Purcell and Appellant.  Allred tried to persuade Appellant to calm down and to give him the gun, but Appellant then shot Allred in the chest with a .380–caliber bullet, severing his aorta and killing him.  Purcell ran out of the back door to the police station next door.  Witnesses saw Appellant flee the bar in a blue Dodge Dakota pickup truck with the license plate 21X–ZJ5.  Appellant was headed in the direction of Jonestown.

Paula Griffith lived in a house in Jonestown with her fifteen-year-old daughter, Haylie Faulkner.  Griffith previously dated Appellant, but they had not had a romantic relationship in some time.  By all accounts, the break-up seemed

amicable, and Appellant kept in touch with Faulkner, even paying her entry fee into some beauty pageants.

On the evening of August 24, Griffith, Faulkner, Faulkner's friend (Danielle Hensley), and Griffith's boyfriend (Jay Feltner) were at Griffith's home preparing for a trip to Fiesta Texas, an amusement park in San Antonio. Griffith had obtained tickets to celebrate the last weekend before the start of school. The group planned to travel to San Antonio on Friday night, spend the day at Fiesta Texas on Saturday, and return to Jonestown late Saturday night. Hensley was to return to her family's home in Leander on Sunday.

On that Friday evening, August 24, Hensley's mother and step-father began to worry when they did not receive a phone call from her because Hensley normally called to say good night. On Saturday, her parents were still unable to reach Hensley, Griffith, or Faulkner. They called the Jonestown police, but the police were unable to assist because the parents did not know the physical address of Griffith's house. When searching the internet for news of any auto accidents or other events that might explain Hensley's failure to make contact, Hensley's step-father learned about the murder in Marble Falls and that the police were looking for a blue Dodge Dakota pickup truck with the license plate number 21X–ZJ5.

On Sunday morning, August 26, Hensley's parents drove to Griffith's home in Jonestown. As they approached the driveway, Hensley's step-father saw a blue Dodge Dakota pickup truck parked near the house. He recognized the license plate number from his internet search the day before, and he knew that something was wrong. He parked a block away and called the police.

After securing the area, the police entered Griffith's home to check on the welfare of the people possibly inside and discovered the four bodies. Feltner had been shot in the head from close range while sitting at the kitchen table. Griffith had been shot in the back of her head, apparently while she was running from the living room. Faulkner had fallen to the living room floor with a gunshot wound to the head. Hensley, who was lying on the living room couch, had four gunshot wounds including a fatal wound to the head. The group had apparently been preparing dinner as raw meat sat out on the counter and the barbecue grill outside was open.

It appeared to the investigators that each of the females' purses had been searched and the contents dumped onto a couch. Feltner's duffle bag had also been searched, and his cell phone was discovered to be missing. A carton of Skydancer cigarettes was on the same couch, and a cigarette butt was found on the floor. No identifiable fingerprints were found at the scene.

Police confirmed that the blue Dodge Dakota pickup truck parked at Griffith's home was the same one that had been used to flee the murder in Marble Falls. Investigators collected three Natural Light beer cans, one empty Sport cigarette package, cigarette butts from the ashtray, and a set of General Motor keys from the pickup. They also discovered that Griffith's white 2001 Saturn station wagon was missing.

4

Meanwhile, beginning Friday night, August 24, Appellant began calling his friend, Brinlee. During his first phone call, Appellant told Brinlee that he had "shot at" six people and "maybe killed two" people. He stated that he "was on the run." During the second call, Brinlee noticed that Appellant was not calling from his cell phone; he was now calling from a new number. It was later determined that Appellant was using Feltner's cell phone. This second call was placed at 11:44 p.m. in the vicinity of a cell tower in Belton, Texas.

During his second or third phone call to Brinlee, Appellant said that "he was going after [Purcell] and her father and mother." He told Brinlee that he had gone to the bar to kill Purcell, but the bartender got in the way. Appellant said that he took a couple of shots at Purcell, but the gun jammed and that was why Purcell was not dead.

Records for Wilson's credit card showed that someone attempted to use it at a Round Rock gas station on August 24. Call records for Feltner's phone showed points along the route that Appellant took as he fled Texas. In addition to the call from the Belton area, Appellant used the phone while he was near the following locations: Mount Sylvan, Texas (Saturday, August 25 at 3:17 a.m.); Okalona, Arkansas (Saturday, August 25 at 9:12 a.m.); Bakerville, Tennessee (Saturday, August 25 at 3:30 p.m.); Shippensburg, Pennsylvania (Sunday, August 26 at 2:40 p.m.); and Siperstein Plaza, New Jersey (Sunday, August 26 at 6:46 p.m.). Appellant was traveling to his mother's home in Shirley, New York.

On Sunday, August 26, while Appellant was driving through Pennsylvania, Griffith's Saturn station wagon began stalling and "riding rough." Appellant decided that he needed a different car, so he left Interstate 81 in the town of Greencastle. Appellant spotted a "nice car" in a driveway. Armed with the gun, he entered the home of Betty DeHart and found the keys to her blue 2006 Hyundai Elantra. He transferred his items from Griffith's car into the Hyundai, including a Walmart bag containing ammunition, Skydancer cigarettes, sunglasses, and a road map. Appellant then continued driving to New York. An expended .380–caliber bullet and shell casing were recovered from DeHart's home. In Griffith's Saturn station wagon, investigators found an identification badge for Griffith, a certificate of Faulkner's participation in a beauty pageant, a paper towel holder, a peanut can, and Powerade, Dr. Pepper, and Coca–Cola bottles.

Around noon on Monday, August 27, Appellant was located at the home of his friend and former employer, Gerald Baldoni, in the Long Island town of Shirley, New York. Baldoni invited the initial officer into his home and told him that Paul was there. The officer called for back-up, and when the officers subsequently entered the home, Appellant came out into the hallway from a bedroom with the gun pointed to his head. Appellant asked the officers to call his mother. He also stated that he did not want to go to jail for what he did because he knew that he was going to spend a long time there. After a short stand-off, Appellant threw down his weapon and surrendered.

Investigators recovered the gun, which had a bullet in the chamber and a loaded magazine. They also recovered Appellant's black cowboy boots, leather vest, cap, and other clothing, and inside the vest's pocket, they discovered Wilson's credit card, a loaded magazine, loose shells, a Bic lighter, a pocket knife, a business card, and a piece of paper with a cell phone number written on it. DeHart's Hyundai was found parked at Baldoni's home; the keys were found in the house. Inside the Hyundai, they recovered Feltner's cell phone and the Walmart bag, which contained a box of 100 Winchester .380–caliber bullets, an open carton of Skydancer cigarettes, a pair of sunglasses, a road atlas with the area around DeHart's home circled in ink.

Pending his extradition to Texas, Appellant was held in custody by the Suffolk County, New York Police Department. Appellant made the following unsolicited statements in the presence of an officer: "They're going to extradite me back to Texas, then probably Tennessee, West Virginia, Pennsylvania, then probably back here. I bet they found me when I turned my damn cell phone on. I had that bitch turned off the whole time and they didn't have a clue where I was"; "I had a good fucking thing going on in Texas, too. Business, house, vehicles. If it wasn't for my stupid fucking girlfriend. One mistake ruined my whole fucking life"; "Do you know how many bodies they found? Five, six in Texas. Maybe 12 bodies." Appellant also spoke with a detective of the Suffolk County Police Department. He described many of the events surrounding the instant offenses, but he did not speak specifically about the acts of shooting or killing.

After his return to Texas, Appellant told a cellmate in the Travis County Jail, "I'll be here for a long time ... I killed six people." Also while in jail, during a recorded conversation with an acquaintance, Tiffany Waldrop, Appellant told Waldrop that he thought that he would be in jail for "[l]ife. I'm getting the death penalty." When Waldrop asked Appellant if he had spoken with Brinlee, Appellant responded, "I've talked to [Brinlee], oh, they don't want him basically him [sic] talking to me right now.... Because it was [Brinlee]'s gun that I used." Appellant also told Waldrop, "I just wish I had never had that gun."

DNA analysis identified Feltner's and Allred's blood on Appellant's boots. Appellant's DNA was on a cigarette butt found at the Jonestown crime scene and on Dr. Pepper and Coca–Cola bottles left in Griffith's Saturn station wagon. A DNA profile consistent with a mixture of Appellant's and Faulkner's DNA was found on a Gatorade bottle also left in the station wagon. Ballistics analysis determined that the bullets recovered from the Llano, Marble Falls, Jonestown, and Pennsylvania crime scenes were all fired from Brinlee's .380–caliber pistol.

*Devoe v. State*, 354 S.W.3d 457, 462–66 (Tex. Crim. App. 2011).

On October 2, 2009, the jury returned its verdict at the guilt-innocence phase of

trial, finding Petitioner guilty beyond a reasonable doubt of capital murder as charged in

the indictment.[4]

C.     Punishment Phase of Trial

The punishment phase of Petitioner's capital murder trial commenced on October

5, 2009.[5]   The Texas Court of Criminal Appeals' opinion affirming Petitioner's

conviction and sentence on direct appeal accurately summarized the evidence presented

during the punishment phase of Petitioner's capital murder trial as follows:

> The evidence presented at punishment revealed that Appellant shot and killed 81-year-old Betty DeHart when he stole her blue Hyundai in Greencastle, Pennsylvania.  DeHart was found lying on her bed with a close-range gunshot wound to the head.  Appellant claimed to have chased her into her home and that he shot her because "she wouldn't stop screaming."
>
> Appellant possessed a lengthy criminal history.  He was incarcerated in Burnet County, Texas, for various misdemeanors.  Before that, he was jailed in Suffolk County, New York, over twenty times between 1980 and 2004, including an incarceration in the Gowanda state prison from 1997 to 2002.  Appellant's convictions in Suffolk County, New York, included aggravated unlicensed operation of a motor vehicle, aggravated harassment, criminal trespass, disorderly conduct, endangering the welfare of a child, two convictions for harassment, three for assault, and four for felony driving while intoxicated.  Appellant's 1989 assault conviction was for shooting another young man with a 12-gauge shotgun following an altercation that Appellant incited; that man testified about that incident and his resulting wounds.
>
> Appellant also had a lengthy history of abusing women.  Appellant told a former neighbor that he "liked to slap the girls around."  Purcell, the woman Appellant attempted to kill in Marble Falls, testified about earlier abuse by Appellant.  On one occasion, he punched her in the face and broke her nose.  On another occasion occurring June 15, 2007, while driving, she and Appellant were run off the road.  Appellant chased down the offending truck, forced it to stop, and pulled the driver—a young woman—out of the truck.  He threatened to beat

---

[4] CR Volume 3, at p. 465; RR Volume 25, at p. 80

[5] The verbatim transcription of the testimony presented and other proceedings taking place during the punishment phase of Petitioner's trial appears in RR Volumes 26 through 29.

up the young woman, but Purcell persuaded him not to do so. Later that same night, Purcell complained that Appellant had been living in her home for four months without paying any bills or helping out. Appellant became angry, and he cut Purcell's clothes off with a knife, punched her several times, and held a knife to her throat. He also hit Purcell with the finial from a bed post, breaking two of her ribs, and he threatened to shoot her. Purcell subsequently kicked Appellant out of her home and obtained a protective order.

Jody Pagel, a woman whom Appellant had dated in the early 1980s while living in New York, testified regarding three incidents involving Appellant. During the first incident, Appellant drank too much and attempted to choke her to death. Pagel testified that the second incident occurred in the house, but she could not recall the facts clearly. During the third incident, they were at a bar when Appellant choked Pagel so hard that he lifted her up off the floor; he then threw her to the ground. Following the assault, Appellant sat at the bar with another woman as if nothing had happened. After Pagel broke up with Appellant, Appellant made harassing phone calls in which he threatened to kill Pagel and her new boyfriend. Pagel reported the calls, and she obtained a protective order.

On December 20, 2006, Appellant went to the emergency room at South Austin Medical Center. When a female physician told him that it would not be a good idea for him to leave the hospital, Appellant spoke aggressively and abusively to someone on the phone and then threatened to physically harm the female doctor.

Mary McNellage testified that Appellant lived in her Spicewood, Texas, home for 89 days. She wanted him to leave due to his lies, drinking, and uncontrolled behavior. McNellage did not want to ask Appellant directly to leave because Appellant had previously physically threatened her. Consequently, she left him a car and a suitcase along with a note that asked him to leave her things alone and "just go." She had also washed and folded his clothes and had packed them and his other belongings in the suitcase and car. McNellage then stayed at a friend's house for 13 days because she was afraid of Appellant's reaction to the note. Appellant refused to leave, but eventually he was forced to go. After McNellage finally returned home, Appellant showed up around 3:00 a.m. saying that he wanted to have sex with her. When she rebuffed his advances, Appellant held a hunting knife to her throat. She managed to fight Appellant off and call 9–1–1. Charges were filed against Appellant, and the case was pending at the time of the capital murders.

Appellant's family confirmed that, when Appellant was in his twenties, he once attempted to strangle his mother with a telephone cord. Following that incident, Appellant's mother obtained a protective order against him.

The jury also received ample evidence from numerous witnesses that Appellant abused alcohol and drugs and that he tended to become more violent when he did so. Appellant's mother testified, via deposition, that Appellant became "very violent" when he was drinking—he "would take things apart, tear

up the house, and break down doors. He would act like that no matter whose house he was at."

Appellant's substance abuse was also the subject of expert testimony. Defense psychiatrist Dr. Robert Cantu interviewed Appellant. His understanding from Appellant was that Appellant had smoked a half to one ounce of methamphetamine in the 12 hours preceding the instant offense, in addition to drinking what Appellant reported as a liter of rum that day. Cantu testified that Appellant would be a danger to others in prison if he had access to large quantities of drugs or alcohol, if he had the opportunity to harm weaker people there, and if he were in an unstructured environment that allowed him to go places without direct supervision. Cantu stated, "I think if those three things ... were present, that he would be a future danger, yes, sir." Cantu also believed that Appellant did "know what he was doing" during the time of the instant offense.

A.P. Merillat, a senior criminal investigator for the Texas Special Prosecution Unit, testified that inmates in Texas prisons have access to drugs, alcohol, and weapons. He further testified that many violent crimes occur inside Texas prisons.

Dr. Richard Coons, a psychiatrist, testified for the State without objection. After interviewing Appellant and reviewing his records, Coons agreed with Cantu's assessment that Appellant would be a continuing threat to society. In Coons's opinion, Appellant was "drug dependent and ... I think if he were given the opportunity, [Appellant] would certainly try to get them, try to use them" in prison. During Coons's interview with him, Appellant described the instant offenses in detail. Appellant told him that he was angry when he shot the gun in Wilson's home, but he said that the shooting of Allred "was an accidental shooting." He claimed that he went to Griffith's home to get money and that he shot Feltner because Feltner came at him (despite the physical evidence that Feltner was seated at the kitchen table). He shot Griffith and the kids because they were screaming. He also stated that he shot DeHart because she was screaming.

Coons concluded that Appellant was not operating under any type of psychosis during the instant offense. He found that Appellant planned his behavior and was "actively responsive to what he [felt] he need[ed] to do." Coons agreed with Appellant's previous diagnoses of psychotic disorder not-otherwise-specified, antisocial behavior, and personality problems, and that Appellant is polysubstance dependent.

In reaching a determination that Appellant would be a future danger, Coons evaluated the following factors: (1) Appellant's long history of violence; (2) the awful set of facts related to the instant offense; (3) Appellant's attitude toward violence, which is impulsive with a lack of empathy; (4) Appellant's antisocial personality behaviors; (5) Appellant's lack of any remorse; and (6) the prison society that Appellant would be in.

The defense's expert, psychologist Dr. Ollie Seay, evaluated Appellant for mental retardation and concluded that Appellant did not fit the criteria for that

diagnosis. Seay did testify, however, that he believed that Appellant may have "possible mental limitations." Neuropsychologist Dr. Leslie Rosenstein surmised that Appellant has deficits and weaknesses in his neurocognitive functioning, but she agreed that Appellant was not legally mentally retarded.

Appellant's aunt, Laura Nelson, and sister, Elizabeth Petrie, testified on his behalf. Nelson stated that she did not think Appellant was treated well by his step-father and that he seemed to be punished a lot. Her memories of Appellant are of a caring, loving, and sharing person. However, Nelson admitted that she had not seen Appellant in several years. She knew that he had relationships with numerous women, that he would live off of them, and that the relationships ended because of fighting.

Petrie testified that Appellant was a typical brother, but he did "smack" her and physically push her while they were growing up. She noted that Appellant did not do well in school and that he started drinking when he was fifteen. She was aware that her brother could be "very violent" and that his relationships with women frequently involved violence. Appellant called Petrie while he was "on the run" in the instant offense, and he told her that he had shot people and did not know if they were alive or dead. Petrie told Appellant to turn himself in and not to hurt anyone else; he responded, "I gotta do what I gotta do." Appellant also presented evidence that he did not have a record of disciplinary problems during his many incarcerations.

*Devoe v. State*, 354 S.W.3d at 466–68.

On October 8, 2009, the jury returned its verdict at the punishment phase of Petitioner's capital murder trial, finding (1) unanimously beyond a reasonable doubt that there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the defendant's personal moral culpability, there are insufficient mitigating circumstances or mitigating circumstance to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[6]

---

[6] CR. Volume 3, at p. 519; RR Volume 29, at pp. 99-100.  Put more simply, the Petitioner's jury answered the two Texas capital sentencing special issues "yes" and "no," respectively.

D.     Direct Appeal

Petitioner appealed.[7]   The Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence on direct appeal on December 14, 2011. *Devoe v. State*, 354 S.W.3d at 468-76. Petitioner did not thereafter seek further review from the United States Supreme Court via a petition for writ of certiorari.

E.     First State Habeas Corpus Proceeding

On September 7, 2011, while his direct appeal was still pending before the Texas Court of Criminal Appeals, Petitioner filed an application for state habeas corpus relief in which he asserted ten grounds for relief, including several claims of ineffective assistance by his trial counsel and a "contingent" claim of ineffective assistance by his state appellate counsel.[8]   In

---

[7]   Petitioner's appellate counsel filed Petitioner's original appellant's brief on October 18, 2010 and an amended appellant's brief on November 8, 2010. In his amended brief, Petitioner's state appellate counsel argued (1) the trial court erred in admitting "copies amounts of extraneous offense evidence," (2) the trial court erred in failing to give a limiting instruction regarding the extraneous offense evidence at the time it was admitted, (3) the trial court erred in failing to grant defendant's motion for mistrial after the prosecutor threw live ammunition into the jury box, (4) the trial court erred in failing to grant defendant a new trial based upon the prosecution's use of peremptory strikes to exclude Roman Catholics from the jury in violation of *Batson*, (5) there was insufficient evidence to establish a probability defendant would commit criminal acts of violence that would constitute a continuing threat to society, (6) it is a violation of the Eighth Amendment to sentence a mentally ill person to death, (7) the trial court erred in failing to permit defendant's counsel to question and rehabilitate a potential juror who was leaning toward life, (8) the evidence was insufficient to support a sentence of death, and (9) the prosecution's case at punishment was unfair because it concerned factors outside of defendant's control or unrelated to defendant personally. *First Amended Brief on Appeal.*

[8]   Petitioner's voluminous state habeas corpus application appears among the pleadings, motions, and other documents filed in Petitioner's "State Habeas Corpus Record" (WR-80,402-01) (henceforth "SHCR"), in Volume 1, at pp. 42-292. The 41 exhibits to Petitioner's state habeas corpus application appear at SHCR, Volumes 2 through 4, at pp. 295-891. As grounds for relief in his state habeas corpus application, Petitioner argued (1) prosecution expert witness A.P. Merillat testified falsely in violation of the rules announced in *Giglio* and *Napue*, (2) Petitioner's trial counsel rendered ineffective assistance in failing to exclude or rebut Merillat's testimony, (3) Petitioner's due process rights were violated by the admission of unreliable scientific testimony by prosecution expert Dr. Richard Coons on future dangerousness, (4) Petitioner's trial counsel rendered ineffective assistance by failing to challenge the admission of Dr. Coons' unreliable testimony on future dangerousness, (5) Petitioner's due process rights were violated by the admission of unreliable scientific testimony from prosecution witness Dr. Richard Coons on the motivations of prisoners serving sentence of life without parole, (6) Petitioner's trial counsel rendered ineffective assistance by failing to challenge the admission of Dr. Coons' unreliable testimony on the motivations of prisoners serving sentences of life without parole, (7) Petitioner's trial counsel rendered ineffective assistance by failing to

11

March, 2012, the State filed its answer to Petitioner's state habeas corpus application and a set of affidavits from Petitioner's trial counsel, court-appointed investigator, and additional documents controverting the assertions in Petitioner's state habeas corpus application.[9]   In an Order issued October 16, 2013, the state habeas trial court set forth its factual findings, conclusions of law, and recommendation that Petitioner's state habeas corpus application be denied.[10]   In an unpublished Order issued January 15, 2014, the Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied state habeas corpus relief.  *Ex parte Paul Gilbert Devoe*, WR-80,402-01, 2014 WL 148689 (Tex. Crim. App. Jan. 15, 2014).

F.     Initial Proceedings in this Court

Petitioner filed his original federal habeas corpus petition in this Court on January 13, 2015 (ECF no. 17).  He filed his 331-page amended petition on March 13, 2015 (ECF no. 22) and, shortly thereafter, a motion to stay and abate this cause to permit him to return to state court to exhaust state remedies on claims arising from Petitioner's alleged incompetence (ECF no.

---

adequately investigate Petitioner's background and present available mitigating evidence, (8) Petitioner's trial counsel rendered ineffective assistance by failing to impeach the guilt-innocence phase trial testimony of prosecution witness Stephen Barr, (9) Petitioner's trial counsel failed to properly preserve unidentified trial court errors, and (10) Petitioner's state appellate counsel rendered ineffective assistance by failing to raise unspecified claims on direct appeal.

[9] The State's Answer to Petitioner's state habeas corpus application appears at SHCR, Volume 5, at pp. 1099-1196.  In addition to extensive briefing addressing Petitioner's claims, the State also furnished the state habeas trial court with a set of detailed affidavits from Petitioner's trial counsel attorneys Tom Weber (two virtually identical affidavits by attorney Weber appears at SHCR Volume 4, at pp. 1069-87 and Volume 5, at pp. 1207-25) and James C. Erickson (SHCR, Volume 5, at pp. 1235-39), Petitioner's court-appointed investigator Joseph W. Thompson (SHCR, Volume 5, at pp. 1241-45), and prosecution expert witness A.P. Merillat (SHCR, Volume 5, at pp. 1198-1205).  The State also furnished a detailed chronology of Petitioner's life created by Petitioner's mitigation specialist Gerald Byington (SHCR, Volume 4, at pp. 1092-94).

[10] The state habeas trial court's Order of October 16, 2013 appears at SHCR, Volume 5, at pp. 1276-1305.

23).[11]   In an Order issued May 15, 2015, this Court granted in part Petitioner's motion for stay

(ECF no. 34).

G.     Second State Habeas Corpus Proceeding

Thereafter, Petitioner filed a second application for state habeas corpus relief.[12]   In an

Order issued January 13, 2016, the Texas Court of Criminal Appeals concluded Petitioner's three

_____

[11]   In his amended federal habeas corpus petition, Petitioner presented claims that (1) the state presented materially false testimony through prosecution expert A.P. Merillat, (2) his due process rights were violated by the presentation of scientifically unreliable testimony from prosecution expert Dr. Richard E. Coons regarding future dangerousness and the lack of motivation of prison inmates serving terms of life imprisonment without parole, (3) Petitioner's current mental incompetence warrants a stay of this federal habeas corpus proceeding, (4) his state habeas corpus counsel rendered ineffective assistance under the standard set forth in *Martinez v. Ryan* by failing to (a) argue that Petitioner was incompetent to assist state habeas counsel during Petitioner's initial state habeas corpus proceeding and (b) failing to adequately investigate, develop, and present evidence during Petitioner's initial state habeas corpus proceeding showing Petitioner's trial counsel failed to adequately investigate Petitioner's background, develop available mitigating evidence, and present such evidence during the punishment phase of Petitioner's trial, (5) the prosecutor violated the Constitution when he threw live ammunition into the jury box, (6) the trial court erred when it failed to grant Petitioner a new trial based upon the prosecution's use of peremptory strikes to exclude members of the Roman Catholic faith from Petitioner's jury, (7) Petitioner's trial counsel rendered ineffective assistance by failing to (a) exclude or impeach the testimony of prosecution expert A.P. Merillat, (b) exclude as unreliable under the Texas Rules of Evidence or rebut the testimony of prosecution expert Dr. Richard E. Coons on the issues of future dangerousness and the motivations of prison inmates serving terms of life imprisonment without the possibility of parole, (c) retain the services of a mitigation specialist throughout the duration of trial, (d) conduct one-on-one interviews with Petitioner's family, (e) explore Petitioner's paternal background, (f) impeach prosecution witness Stephen Barr with evidence of Barr's prior criminal record and Barr's pretrial attempt to solicit a bribe from Petitioner's uncle, and (g) adequately investigate Petitioner's background and develop and present available mitigating evidence showing (i) Petitioner's in utero exposure to alcohol, (ii) Petitioner's sexual abuse by a parish priest, (iii) Petitioner's exposure to toxins from painting without adequate safety equipment, (iv) Petitioner's borderline intellectual functioning, (v) Petitioner's good character traits, (vi) the alcoholic, immoral, physically and sexually abusive nature of Petitioner's paternal relatives, (vii) Petitioner's mother was born in a sanitarium, (viii) the mental retardation and Bi-Polar disorders present in Petitioner's family, (ix) the inaccuracies of professional predictions of future dangerousness, (x) Petitioner's mother is mentally retarded, (xi) Petitioner's mother drank heavily while pregnant with Petitioner, (xii) Petitioner's family taught how to lie, cheat, steal, and fight, (xiii) the alcoholic, abusive nature of Petitioner's step-father, (xiv) Petitioner suffered multiple head injuries, some involving loss of consciousness, (xv) Petitioner suffers from Fetal Alcohol Syndrome and Fetal Alcohol Effects, (xvi) Petitioner's genetic predisposition toward addiction and alcoholism, (xvii) Petitioner's undiagnosed ADHD, (xviii) Petitioner's anger control issues, (xix) Petitioner's frontal lobe damage explains his aggressive behavior, and (xx) Petitioner posed a danger only to women with whom he had been romantically involved, (xxi) Petitioner's mental "decomposition" in the weeks leading up to the murders, (xxii) Petitioner's good record of behavior while in prison, (xxiii) Petitioner's declining mental health, and (xxiv) Petitioner's alcohol and methamphetamine intoxication at the time of his offenses, and (8) Petitioner's appellate counsel rendered ineffective assistance by failing to challenge on appeal the admission of Dr. Coons' testimony.

[12]   The records from Petitioner's second state habeas corpus proceeding appear on a separate diskette submitted by Respondent only recently.   In his second state habeas corpus application, Petitioner argued as claims

13

new grounds for relief failed to satisfy the requirements for a successive state habeas corpus application under Article 11.071, §5(a) of the Texas Code of Criminal Procedure and summarily dismissed Petitioner's second state habeas corpus application. *Ex parte Paul Gilbert Devoe*, WR-80,402-02, 2016 WL 157980 (Tex. Crim. App. Jan. 13, 2016).

H.   Return to this Court

In an Order issued January 21, 2016, this Court lifted the stay in this cause (ECF no. 39). On March 21, 2016, Respondent filed a response to Petitioner's amended petition (ECF no. 40). On May 23, 2016, Petitioner filed his reply to Respondent's response (ECF no. 43).

## II. The AEDPA Standard of Review

Because Petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court's review of Petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  Under the AEDPA standard of review, this Court cannot grant Petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

---

for relief that (1) due to the ineffective assistance of his initial state habeas counsel, he was unable during his first state habeas corpus proceeding to present a claim that his trial counsel rendered ineffective assistance by failing to continue to challenge Petitioner's competence to stand trial after Petitioner was returned from a state mental facility with a diagnosis that he was competent to stand trial, (2) his first state habeas counsel failed to thoroughly investigate and present *Wiggins* claims attacking the failure of Petitioner's trial counsel to fully investigate Petitioner's background and present all available mitigating evidence, and (3) his due process rights were violated throughout Petitioner's trial and state post-conviction case due to Petitioner's mental incompetence and resulting inability to assist his counsel.

evidence presented in the state court proceeding.  *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) (1) have independent meanings.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Brown v. Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'").  A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'"  *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.  *Brown v. Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *McDaniel v. Brown*, 558 U.S. 120, 132-

33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d) (1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has explained:

> Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, 132 S. Ct. 26, 27, 181 L. Ed. 2d 328 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, 135 S. Ct. 1, 2, 190 L. Ed. 2d 1 (2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption

with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e) (1).   It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.   Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, 132 S. Ct.

124 (2011); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. *Giglio-Napue-Brady* Claims & the Testimony of A.P. Merillat

A.     The Claim

In his first claim for relief in his amended federal habeas corpus petition, Petitioner argues the state presented materially false testimony through prosecution expert A.P. Merillat in violation of due process principles.[13]  More specifically, Petitioner argues that during his trial testimony Merillat (1) misrepresented the overall scope and frequency of violence within the Texas prison system, (2) falsely testified about an incident in which Merillat described one inmate beating his "cellmate" to death after drinking alcohol, and (3) falsely testified regarding the manner in which he was compensated for testifying at Petitioner's trial.  Petitioner argues admission of the foregoing false testimony violated the principles announced in *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).

---

[13] Petitioner's Amended Petition, filed March 13, 2015 (ECF no. 22) (henceforth "Amended Petition"), at pp. 24-51.

B.    State Court Disposition

Petitioner included a somewhat similar attack upon Merillat's trial testimony as his first claim for relief in his state habeas corpus application.[14] In response, the state furnished the state habeas court with a lengthy and detailed affidavit from Merillat in which he (1) set forth the specific details of the incident Merillat personally investigated in which a Texas Department of Criminal Justice ("TDCJ") inmate named Michael Thomas was charged with a prison disciplinary infraction for having ingested homemade alcohol, wrestling with fellow inmate Dale Dunbar, and causing Dunbar a fatal head injury, (2) explained while the Special Prosecution Unit ("SPU") of which he is a part pursued criminal charges against Thomas, a Freestone County grand jury chose not to indict Thomas for Dunbar's murder, (3) explained he referred to the incident in question during his testimony at Petitioner's trial for the purpose of illustrating the fact that TDCJ inmates have, upon occasions, been able to obtain access to alcohol while inside prison facilities, (4) his reference during his trial testimony to Thomas and Dunbar as "cellmates" was not intended to mislead the jury because the two men did, in fact, consume

---

[14]    Petitioner's first ground for relief in his state habeas corpus application argued (1) Merillat's descriptions of the level of violence within the Texas prison system was refuted by statistical information available from state sources showing that *compared to the size of the total state prison population*, the number of "serious" incidents of violence was low, (2) Merillat included a number of false statements in his anecdotes about incidents of violence within the Texas prison system, e.g., when describing a 2006 prosecution in Freestone County for an incident in which two inmates consumed alcohol together and an altercation between the two men resulted on one suffering a fatal head injury, Merillat failed to mention the surviving inmate was later no-billed by a Freestone County grand jury and erroneously described the two inmates as "cellmates" when they were merely "friends," (3) Merillat falsely testified he was investigating an incident in which one inmate beat another to death without the use of any weapons other than his own hands and feet, (4) Merillat gave false testimony at Petitioner's trial regarding the amount and type of his compensation and motivation for testifying, including falsely asserting that testifying as an expert was not part of his official job duties at Petitioner's trial. SHCR, Volume 1, at pp. 52-82. While his first claims for relief in this Court focuses extensively on the Supreme Court's holding in *Brady v. Maryland*, Petitioner's initial claim in his state habeas corpus application did not fairly present a *Brady* claim to the state habeas court. Instead, Petitioner's first claim for state habeas relief focused on his *Giglio* and *Napue* claims.
    In his state habeas corpus application Petitioner also argued Merillat had testified falsely in other trials and falsely represented the details of a pair of murders within the TDCJ in a book Merillat wrote. SHCR, Volume 1, at p. 66. Petitioner did not, however, offer any rational explanation as to why such allegedly false hearsay statements had any relevance to Merillat's testimony at Petitioner's trial.

alcohol together in the same cell, (5) insisted, as he had at Petitioner's trial, that testifying as an expert on prison violence and prison conditions was not a task he was required to perform as a part of his official job duties but, rather, was a service he performed when subpoenaed or requested to do so by parties to litigation, (6) explained he and the SPU had, over the past twenty years, investigated a wide variety of criminal activity within the TDCJ, both with and without the participation of the TDCJ's Office of the Inspector General, including threats made by TDCJ inmates against a federal judge, sexual assaults committed by a TDCJ official at the TDCJ's Hobby Unit for female inmates, and an inmate's forgery of parole papers which were sold to other inmates, (7) asserted the number of inmates within the TDCJ does not have any bearing on his trial testimony concerning the number of incidents of criminal activity he and the SPU have investigated over the years, (8) alleged the statistics cited by Petitioner regarding the number of "homicides" within the TDCJ in calendar year 2003 was inaccurate and cited three specific instances of homicides committed within the TDCJ that same year, (9) explained the assault statistics cited by Petitioner from the TDCJ's Emergency Action Center refer only to what that office interprets as  "serious" assaults (defined by the TDCJ's Emergency Action Center as assaults requiring more than first aid to treat) while Merillat and the SPU are responsible for investigating all assaults within the TDCJ, (10) pointed out that one of the inmate murders Petitioner claimed Merillat had "misrepresented" during Merillat's testimony in other cases and in a book Merillat wrote had resulted in the conviction of the responsible inmate (Rogelio Cannady) for capital murder and that inmate's subsequent execution, (11) pointed out the autopsy performed in another case he investigated showed the inmate-victim in that case (Ronder Townsell) had received extensive injuries over a period of time suggesting the victim had been

tortured for several weeks by the responsible inmate (Chris Hubbard) who later pleaded guilty to manslaughter, (12) rejected Petitioner's contention that he had ever misrepresented the nature or seriousness of either of the two foregoing homicides he had investigated, (13) denied he had ever failed to timely respond to an Open Records request directed to him by Petitioner's counsel or anyone else, (14) explained that, at the time of Petitioner's trial, Merillat was investigating the June 2008 murder of inmate Richmond Reynolds by inmate Brandon Vanstory, a charge to which Vanstory later pleaded guilty, (15) explained that prior to 2008 he did not charge any fee for his expert testimony but he thereafter began charging for (a) his travel expenses when he is required to stay away from home overnight and (b) he now charges a fee to compensate him for the vacations days he must use when he leaves his office to testify across the state, (16) insisted he has informed his superiors of all charges he requests for testifying, and (17) insisted he has never solicited the opportunity to testify in a capital case and has never testified regarding a particular inmate's risk of future dangerousness.[15]  Petitioner did not furnish any affidavits or other evidence to the state habeas corpus court refuting or rebutting the information contained in Merillat's affidavit.  In fact, the portion of Petitioner's state habeas corpus application addressing Merillat's allegedly false trial testimony concerning the frequency of violence within the TDCJ contains significant omissions in terms of its statistical charts and tables.[16]

The state habeas trial court (1) found testimony similar to Merillat's testimony at Petitioner's trial regarding the general availability of drugs to inmates within the TDCJ had been

---

[15] Affidavit of A.P. Merillat, SHCR, Volume 5, at pp. 1198-1205.

[16] SHCR, Volume 1, at pp. 56-61.  In addition, Exhibit 9 to Petitioner's state habeas corpus application, which purports to contain homicide statistics for the TDCJ "from 1983 to present" does not, in fact, contain any documentation whatsoever.  SHCR, Volume 2, at pp. 418-19.

held admissible under Texas evidentiary rules where experts indicated that a defendant's access to drugs could affect the defendant's propensity for violence, (2) found any discrepancies between Merillat's statistical testimony at trial and the statistics cited by Petitioner in his state habeas corpus application are the product of different information coming from different sources, (3) found there was nothing false or misleading about any of the anecdotal testimony Merillat furnished regarding instances of prison violence he had investigated, (4) found Merillat's affidavits refused Petitioner's assertion that Merillat had failed to respond to an Open Records request, (5) found Merillat's affidavit furnished credible testimony regarding how he charges fees for his travel and out of the office expenses, (6) found Merillat's trial testimony was not tailored to address Petitioner's propensity for future violence, (7) found that, aside from Merillat's trial testimony the jury heard ample evidence of Petitioner's propensity for future dangerousness, including testimony regarding Petitioner's history of violence while under the influence of alcohol, (8) concluded Merillat's trial testimony was not perjurious, (9) concluded the State did not knowingly use perjured testimony in sponsoring Merillat as an expert, (10) concluded any error in the admission of Merillat's trial testimony did not harm Petitioner, and (11) concluded Petitioner had failed to show prosecutorial misconduct in connection with Merillat's trial testimony.[17]  The Texas Court of Criminal Appeals adopted the factual findings and conclusions of law issued by the state trial court when it rejected Petitioner's first state

---

[17] SHCR, Volume 5, at pp. 1277-80.

habeas corpus application on the merits. *Ex parte Paul Gilbert Devoe*, WR-80,402-01, 2014 WL 148689, *1 (Tex. Crim. App. Jan. 15, 2014).[18]

C.   Clearly Established Federal Law

1.   *Giglio-Napue* Claim

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54; *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (a conviction obtained through false evidence known to be such by representatives of the State violates a defendant's constitutional rights); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir.) ("The Supreme Court has held that the Due Process Clause is violated when the government knowingly uses perjured testimony to obtain a conviction."), *cert. denied*, 132 S. Ct. 854 (2011); *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

---

[18] Three concurring Justices expressly disavowed the portion of the Court majority's Order adopting the trial court's findings and conclusions. This does not alter the fact the majority of the Texas Court of Criminal Appeals adopted those findings and conclusions.

2.    *Brady* Claim

"'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused. *Banks v. Dretke*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976).    This duty also applies to impeachment evidence. *Strickler v. Greene*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 & 685, (1985).

The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor.  *Strickler v. Greene*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. at 281; *Kyles v. Whitley*, 514 U.S. at 437.

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks v. Dretke*, 540 U.S. at 691; *Strickler v. Greene*, 527 U.S. at 281-82.    Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Smith v. Cain*,

132 S. Ct. 627, 630 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks v. Dretke*, 540 U.S. at 698-99. A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith v. Cain*, 132 S. Ct. at 630; *Kyles v. Whitley*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See United States v. Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668 (1984), analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles v. Whitley*, 514 U.S. at 434-35. Third, once materiality is established, harmless error analysis has no application. *Kyles v. Whitley*, 514 U.S. at 435-36. Finally, materiality must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. at 436-37.

## D.   AEDPA Analysis

Analysis of Petitioner's claims regarding the trial testimony of A.P. Merillat must begin with an accurate recitation of exactly how Merillat testified during Petitioner's trial. The Texas Court of Criminal Appeals' opinion on Petitioner's direct appeal accurately summarized Merillat's testimony at Petitioner's trial as focusing on his unremarkable expert opinions that, based upon his decades spent investigating crimes within the TDCJ, Texas prison inmates have access to drugs, alcohol, and weapons and many violent crimes occur inside Texas prisons.

*Devoe v. State*, 354 S.W.3d at 467.  This Court's independent review of Merillat's trial testimony shows on direct examination he testified in pertinent part (1) he had spent more than twenty years investigating and assisting in the prosecution of crimes committed within the TDCJ, (2) he knew of many incidents in which TDCJ inmates had obtained access to contraband, including drugs, alcohol, and cell phones, (3) he was familiar with the TDCJ's classification system for classifying inmates according to their behavior, (4) persons convicted of capital murder who received sentences of life without parole would enter the TDCJ general population initially at the middle level of the classification system (G-3) and, at present, cannot rise higher than that level, (5) nonetheless G-3 inmates live in the general prison population, have cell mates, and have a degree of freedom from full time restraint, i.e., they enjoy the same privileges as many other inmates to attend classes, work, obtain medical treatment, have visitors, etc., (6) his unit has investigated hundreds of instances in which TDCJ inmates possessed street drugs, including drugs found in high security areas, (7) inmates in the general prison population have access to a wide variety of materials which they fashion into homemade weapons, including pens, pencils, pieces of glass, and metal – all used to stab others, (8) such homemade weapons have even been found on death row, (9) at present, inmates sentenced to serve terms of life without parole are not automatically sent to administrative segregation but enter the general prison population, (10) upon occasion, an inmate will be transported outside the TDCJ's facilities to an outside medical facility or to attend a state court hearing and are housed at local jails during those stays away from the TDCJ, (11) there are women who work every day inside TDCJ prison facilities as guards and in other capacities, (12) there have been escapes from all levels of TDCJ facilities over the years, (13) he worked a case in which one inmate beat another inmate to death using

27

only his hands and feet, (14) he worked a case in which a TDCJ inmate obtained access to a cell phone and made threatening calls to a state senator, (15) he has investigated crimes committed in all parts of TDCJ facilities, (16) since 1984, there has not been a year without at least one homicide inside TDCJ, (17) he has assisted in the prosecution of inmates convicted of capital murder, (18) some of his unit's prosecutions have been hampered by a lack of witnesses or victims who did not wish to pursue charges against their attacker, (19) public information officers within TDCJ have a different job and would not have the same access to crime scenes within TDCJ facilities, and (20) a person sentenced to serve a term of life imprisonment without the chance of parole would have the opportunity to commit acts of violence while in prison society.[19]   On cross-examination, Merillat testified in pertinent part (1) he gets paid for his testimony in cases because it compensates him for the vacation time he loses when he leaves his office to testify across the state, (2) he had done no research at all on Petitioner's history in jails or prisons, (3) a G-3 prisoner serving life without parole cannot work outside the fences of a TDCJ unit unless under the "direct arms supervision" of a guard, and (4) there is a TDCJ prison disciplinary system designed to take away good conduct time credits and other privileges if inmates violate prison rules.[20]

1.   State Constitutional Claims Without Merit

Insofar as Petitioner argues in his first claim for federal habeas corpus relief that his rights under the Texas Constitution were violated, those claims are without arguable merit.

---

[19]  Testimony of A.P. Merillat, RR Vol. 27, at pp. 5-53; SHCR, at pp. 2569-80.

[20]  Testimony of A.P. Merillat, RR Volume 27, at pp. 52-69; SHCR, at pp. 2580-85.  On re-direct, Merillat added (1) over the years he had been subpoenaed by both defense counsel and prosecutors in capital cases but had been asked to testify only by the prosecution and (2) he had no stake in the outcome of Petitioner's trial. *Id.*, RR Vol. 27, at pp. 69-70; SHCR, at p. 2585.

Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)(recognizing federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law).  In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court. *Estelle v. McGuire*, 502 U.S. at 67-68; *Lewis v. Jeffers*, 497 U.S. at 780; *Pulley v. Harris*, 465 U.S. at 41.

> When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.

*Coleman v. Thompson*, 501 U.S. 722, 730 (1991).  Petitioner's complaints that his rights under the Texas Constitution were violated by the prosecution's actions vis-à-vis the trial testimony of A.P. Merillat do not furnish a basis for federal habeas corpus relief.

2. *Giglio-Napue* Claim

The Fifth Circuit has explained the constitutional principles applicable to Petitioner's first claim herein as follows:

> The Supreme Court has repeatedly held that "a conviction obtained through false evidence, known to be such by representatives of the State" violates a defendant's constitutional rights.  A violation occurs where there is a "deliberate deception of court and jury by the presentation of testimony known to be perjured."  "The same result obtains when the State, although not soliciting false evidence, allows

29

> it to go uncorrected when it appears." To obtain relief, [Petitioner] must show "1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." The testimony is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."

*Canales v. Stephens*, 765 F.3d at 573 (Citations omitted).

Mere discrepancies between the testimony of witnesses do not, standing alone, establish knowing use of perjured or false testimony. *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988). Mere differences of opinion between expert witnesses do not, standing alone, establish that either expert furnished false, misleading, or perjured testimony. *Clark v. Johnson*, 202 F.3d 760, 766-67 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000); *Boyle v. Johnson.* 93 F.3d 180, 186-87 (5th Cir. 1996), *cert. denied*, 519 U.S. 1120 (1997). Moreover, misleading or false testimony warrants federal habeas relief only when there is a reasonable likelihood that its correction would have affected the jury's verdict. *See Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir.) (holding any misleading testimony given by prosecution expert on future dangerousness did not warrant federal habeas relief where petitioner had been convicted of the brutal rape and strangulation of an elderly woman and additional evidence showed petitioner raped his ten-year-old step-daughter, had a lengthy criminal history, and repeatedly escaped from incarceration), *cert. denied*, 525 U.S. 940 (1998); *Goodwin v. Johnson.* 132 F.3d 162, 185 (5th Cir. 1998) ("False evidence is 'material' only 'if there is any reasonable likelihood that [it] could have affected the jury's verdict.'").

Merillat's trial testimony and that of defense prison conditions expert Larry Fitzgerald differed not so much in factual content as in tenor and tone.[21] Fitzgerald attempted to emphasize

---

[21] Having independently reviewed the testimony of both experts, the Court is reminded of the saying about two people viewing the same glass of water: one sees it as half-full while the other sees the same glass as half-

the significant restrictions imposed upon TDCJ prisoners living within the general prison population.  Merillat's testimony emphasized the opportunities a general population prisoner (including one serving a term of life without parole) would have to obtain access to drugs and weapons and to engage in acts of violence.  The actual conflicts in the testimony of Merillat and Fitzgerald were insignificant in nature.  For instance, Merillat testified he was aware of no legal impediment to a G-3 prison inmate working outside prison walls so long as the inmate was under "direct arm" supervision.[22]  Fitzgerald insisted, however, that, while a G-3 inmate serving life without parole could be taken outside prison walls under direct supervision, such an inmate would not be permitted to *work* outside prison walls.[23]  Both experts agreed an inmate convicted of capital murder would enter the TDCJ classification system as a G-3 inmate and could rise no higher.[24]  Both men agreed that a G-3 inmate serving a term of life without parole could work in the wood or craft shop of a TDCJ prison unit with the express authorization of the unit's warden.[25]  Both men also agreed there is a lot of violence within the TDCJ's prison population.

The state habeas trial court found Merillat's testimony was neither false nor misleading and that Merillat had not committed perjury.  Having independently reviewed the entirety of Merillat's trial testimony, the Petitioner's voluminous pleadings and exhibits in Petitioner's state habeas corpus proceeding, and Petitioner's pleadings in this proceeding, this Court concludes the

---

empty.  It would not be inaccurate to describe the differences between Merillat's and Fitzgerald's trial testimony in the same manner.

[22] Testimony of A.P., Merillat, RR Vol. 27, at pp. 58-59.

[23] Testimony of Larry Fitzgerald, RR Vol. 27, at pp. 159-60.

[24] Testimony of Larry Fitzgerald, RR Vol. 27, at p. 163; Testimony of A.P. Merillat, RR Vol. 27, at p. 21.

[25] Testimony of A.P. Merillat, RR Vol. 27, at pp. 33-34; Testimony of Larry Fitzgerald, RR Vol. 27, at p. 178.

state habeas trial court's factual determination was fully supported by the record presented before that court. The state habeas court's factual findings, which the Texas Court of Criminal Appeals expressly adopted, are an eminently reasonable determination of the facts in light of the evidence presented in Petitioner's state court proceeding, especially Merillat's uncontroverted affidavit. *See Wood v. Allen*, 558 U.S. at 301 ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). Petitioner's arguments about Merillat's testimony in his pleadings in this Court consist primarily of attacks upon the credibility of Merillat's testimony based upon either (1) alleged errors in the details of some of the anecdotes Merillat used during his trial testimony to illustrate his opinions that (a) drugs, alcohol, and weapons were available to TDCJ general population inmates and (b) there is an opportunity for TDCJ general population inmates who wish to engage in acts of violence to do so within TDCJ facilities and (2) statistics which do not genuinely contradict Merillat's assertions that he has personally investigated crimes of violence committed in all areas of TDCJ facilities, committed by inmates at all levels of classification. Petitioner presented the state habeas trial court with no evidence (affidavits or sworn testimony from persons possessing personal knowledge of the relevant facts) showing Merillat testified falsely about any of the anecdotal incidents of violence he mentioned during his trial testimony. Instead, Petitioner relied upon conclusory assertions that Merillat's descriptions of some of the incidents in question varied from the descriptions of those same incidents contained in ill-defined appellate court opinions.[26] The state habeas trial court acted in an eminently reasonable manner

---

[26] The state habeas trial court could reasonably have concluded Merillat's first-person affidavit furnishing details of his personal knowledge gained through his investigation of a particular act of violence within the TDCJ was not refuted by the appellate court opinion to which Petitioner loosely referred. Courts are generally limited to considering the admissible evidence before them. Merillat, in contrast, was not limited by the rules of evidence

in accepting Merillat's versions of those incidents which were based upon Merillat's personal knowledge, as opposed to allegedly contradictory appellate court opinions.  Petitioner made no serious effort before the state habeas court, and makes no serious efforts in this Court, to address the meticulously detailed affidavit Merillat furnished the state habeas trial court responding to each of the attacks upon Merillat's credibility presented by Petitioner's state habeas counsel.

Most significantly, Petitioner failed to present the state habeas trial court with any specific factual allegations or evidence showing either (1) Merillat actually gave false or misleading testimony during Petitioner's capital murder trial, (2) the falsity of which was material in that there was a reasonable likelihood it affected the judgment of the jury in Petitioner's trial, or (3) the prosecution used the testimony in question *knowing* it was false.  The same can be said for Petitioner's pleadings in this cause.[27]  Petitioner argues with citations to statistical data that the incidence of violence within the TDCJ is much lower than that described by Merillat during Petitioner's trial *when the entire prison population of the State of Texas is considered.*  The problem with this argument is Merillat offered virtually no testimony during Petitioner's trial addressing the frequency of violence within the TDCJ.  Instead, he simply

---

when he collected information during his investigations - which may have produced a vastly different base of information than was available to the appellate court which crafted an opinion from the record before it.  Moreover, Petitioner identifies no specific language in any particular appellate court opinion suggesting the brief allusions to any of the incidents in question furnished by Merillat during his trial testimony were factually inaccurate or misleading or that any misleading or false assertions made by Merillat in his anecdotal references to cases he investigated were material to the jury's consideration of the evidence at Petitioner's trial.  As explained above, Merillat used several anecdotes to illustrate his testimony that TDCJ inmates in general population have been able upon occasion to obtain access to alcohol, drugs, cell phones, and other materials from which they have fashioned homemade weapons.

[27] While Petitioner alleges Merillat was twice found to have testified falsely at other capital murder trial regarding the details of the TDCJ's inmate classification system (Amended Petition, at pp. 33-34), Petitioner does not allege Merillat committed the same error (i.e., erroneously describing the pre-2005 TDCJ classification system during capital murder trials) when Merillat testified at Petitioner's 2009 capital murder trial.  In fact, Petitioner identifies no error committed by Merillat in describing the TDCJ's inmate classification system during Petitioner's trial.  That testimony appears at RR Volume 27, at pp. 18-27, 33-34, 58-61; SHCR, at pp. 2572-74, 2576, 2582-83.

33

testified he and the Special Prosecution Unit of which he is a part had investigated a wide variety of violent criminal offenses committed by many different types of TDCJ inmates, at all levels of the classification system. This Court has searched in vain for any hint of hard statistical information in Merillat's trial testimony other than Merillat's assertion there had been at least one homicide within TDCJ every year since 1984. When Petitioner challenged that specific testimony during Petitioner's state habeas corpus proceeding by arguing there had been no homicides within TDCJ in 2003, Merillat responded in his affidavit by specifically identifying three homicides within TDCJ during that year. This Court independently concludes Petitioner has failed to identify any factually inaccurate, false, or misleading testimony given by Merillat during Petitioner's 2009 trial.

This Court also independently concludes there is no reasonable likelihood any arguably inaccurate, false, or misleading testimony by Merillat identified by Petitioner affected the jury's deliberations at the punishment phase of Petitioner's trial. Petitioner's trial counsel presented extensive documentary evidence and expert testimony during the punishment phase of Petitioner's trial showing Petitioner's past prison record for good conduct and argued Petitioner did not pose a risk of future dangerousness. Petitioner's past good prison behavior, however, pales in comparison to the fact that, by the time Merillat testified at the punishment phase of Petitioner's trial, (1) the jury had already found Petitioner guilty beyond a reasonable doubt of brutally murdering a pair of teenage girls, (2) there was overwhelming evidence in the record showing, in addition to the girls, Petitioner murdered four other people at two other locations during the same rampage, (3) the evidence also showed each of Petitioner's adult victims was killed with a single fatal shot, and (4) the evidence showed Petitioner had never expressed any

34

sincere remorse or genuine contrition following his arrest. Instead, a police officer from New York testified without contradiction, when arrested, Petitioner blamed his former girlfriend for his legal problems.[28] Petitioner has failed to identify any error or misleading testimony in Merillat's trial testimony at Petitioner's trial reasonably likely to have affected the outcome of the punishment phase of Petitioner's capital murder trial.[29]

Finally, this Court independently concludes Petitioner has failed to allege any specific facts showing the prosecution knowingly elicited any factually inaccurate or misleading testimony from Merillat during Petitioner's 2009 capital murder trial. The fact Merillat may have testified erroneously in other cases regarding the details of the TDCJ's inmate classification system does not in any way establish a *Giglio* or *Napue* violation where there is no showing Merillat testified erroneously during Petitioner's 2009 trial. *See Clark v. Johnson*, 202 F.3d at 767 (holding disagreement between experts over the validity of the ultimate conclusion reached by a prosecution expert was insufficient to overcome the state habeas court's factual determination that the prosecution expert's trial testimony was neither false nor misleading).

---

[28] Testimony of Kenneth Bombace, RR Volume 23, at p. 165.

[29] Insofar as Petitioner argues Merillat testified in a misleading manner during Petitioner's trial regarding how Merillat was compensated for his testimony, Petitioner offered the state habeas trial court no evidence showing Merillat's brief trial testimony on cross-examination describing the fact he was paid for the loss of vacation days and for his other expenses was factually inaccurate: "I get paid because I have to take vacation time to be here, so I try to get back what it is costing me to be here today." RR Vol. 27, at p. 54; SHCR, at 2581. Merillat explained in his detailed affidavit submitted to the state habeas trial court that he began seeking to be compensated for his travel expenses and his lost vacation days because of the financial and personal burden of being away from his home and office for extended periods. SHCR, at p. 1203. In response, Petitioner furnished the state trial court nothing but conjecture and speculation suggesting Merillat was "double-dipping." The state habeas trial court reasonably found there was nothing misleading about Merillat's brief trial testimony on this subject.

3.   _Brady_ Claim

Petitioner did not fairly present his _Brady_ claim to the state court during his initial state habeas corpus proceeding.  Therefore, this Court will review that aspect of his first claim for federal habeas relief _de novo_.  Merillat's detailed affidavit defending his anecdotal descriptions of various violent acts within TDCJ prisons he has investigated stands in stark contrast to Petitioner's conclusory assertions that the prosecution withheld unidentified impeachment evidence from the defense.  Petitioner presented the state habeas court and presents this Court with no evidence showing Merillat's anecdotal descriptions of any of the incidents he mentioned during his trial testimony were factually inaccurate or misleading in any material way.  On the contrary, when challenged by Petitioner during the initial state habeas corpus proceeding, Merillat furnished highly detailed accounts of each of the incidents in question which supported his far more generic descriptions of those same incidents during Petitioner's trial.[30]  Petitioner has presented this Court with no evidence contradicting any of the factual assertions contained in Merillat's detailed affidavit.  For example, Petitioner argues Merillat erroneously described as "cell mates" two inmates who imbibed homemade alcohol and then engaged in a violent wrestling match which resulted in a fatal head injury to one of the inmates.  As Merillat points out in his affidavit, Merillat mentioned the incident in question to illustrate his assertion that TDCJ inmates have been able upon occasion to gain access to alcohol (with dire consequences resulting).  The fact the two inmates may not have technically been "cell mates" was not misleading where the facts of the case as described in Merillat's uncontroverted affidavit establish the inmates were friends and located in the same cell at the time of the incident in

---

[30] SHCR, at pp. 1198-1205.

question.  Likewise, Merillat's affidavit furnishes detailed accounts of all of the other incidents which Petitioner claims were inaccurately described by Merillat during trial.  Merillat's highly detailed affidavit fully supports Merillat's more generic descriptions of those same incidents at trial.  Petitioner has furnished no affidavit or testimony from any person possessing personal knowledge of those incidents which contradicts Merillat's affidavit's accounts of the incidents in question or his assertions regarding the disposition of the criminal charges and prison disciplinary proceedings brought against the responsible inmates he identified in his affidavit.

This Court independently concludes there is no reasonable probability that, but for the alleged failure of the prosecution or Merillat himself to disclose any of the alleged errors in Merillat's anecdotal descriptions of violent incidents within the TDCJ, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.  Any effort to impeach Merillat at Petitioner's trial through the same arguments raised by Petitioner's state habeas counsel (in Petitioner's first state habeas corpus application) or Petitioner's federal habeas counsel (in Petitioner's pleadings herein) would in all reasonable probability have resulted in the same devastating responses from Merillat shown in his affidavit.  A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith v. Cain*, 132 S. Ct. at 630; *Kyles v. Whitley*, 514 U.S. at 434.  There is no reasonable probability that any efforts to impeach Merillat at trial in the same manner as urged by Petitioner's state habeas counsel in Petitioner's first state habeas proceeding and Petitioner's federal habeas counsel herein would have altered the outcome of the punishment phase of Petitioner's capital murder trial.  The alleged errors

identified by Petitioner in Merillat's trial testimony either relate to insignificant details in those anecdotal accounts or are completely refuted by the sworn assertions contained in Merillat's affidavit. The allegedly false and misleading assertions in Merillat's trial testimony do not, in light of Merillat's un-contradicted affidavit, undermine confidence in the jury's verdict at the punishment phase of Petitioner's capital murder trial. Petitioner's allegations of false and misleading testimony by Merillat do not satisfy the materiality prong of *Brady* analysis.

E.     Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's *Giglio* and *Napue* claims in the course of Petitioner's first state habeas corpus proceeding was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding. Under *de novo* review, Petitioner's unexhausted *Brady* claim fails to satisfy the materiality prong of *Brady* analysis. Petitioner's reliance upon alleged violations of his rights under the Texas Constitution is misplaced. Petitioner's first claim for federal habeas corpus relief does not warrant relief.

## IV. **Admission of Dr. Coons' Testimony on Future Dangerousness**

A.     The Claim

In his third claim for federal habeas corpus relief, Petitioner argues the admission at his trial of the testimony of prosecution expert Dr. Richard Coons on the subject of future dangerousness violated due process principles because (1) Dr. Coons' methodology (a clinical unstructured interview) in formulating his opinion regarding Petitioner's future dangerousness

was scientifically unreliable, (2) clinical predictions of future dangerousness are considered unreliable in the scientific community, (3) the Supreme court's opinion in *Barefoot v. Estelle*, 463 U.S. 880 (1983), allowing the admission of expert opinions regarding future dangerousness has been undermined by the Supreme Court's opinion in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993), and (4) Dr. Coons' opinion testimony as to future dangerousness was inadmissible under state evidentiary principles.[31]

B.      State Court Disposition

Petitioner complained as part of his final point of error on direct appeal about the admission of the testimony of Dr. Coons on the issue of future dangerousness.  The Texas Court of Criminal Appeals held (1) Petitioner had made no timely objection to Dr. Coons' qualifications or competency as an expert, (2) Petitioner raised no constitutional challenge before the trial court to the admission of Dr. Coons' testimony, (3) Petitioner's appellate counsel failed to present any argument on appeal as to why Dr. Coons was not competent to testify at Petitioner's trial, (4) Petitioner preserved nothing for appellate review, but (5) alternatively rejected the argument on the merits, concluding expert testimony such as Dr. Coons' satisfied the heightened reliability requirement of the Eighth Amendment.  *Devoe v. State*, 354 S.W.3d at 476 (quoting *Barefoot v. Estelle*, 463 U.S. 880 (1983)).

Petitioner presented the same basic claim as his third ground for relief in his first state habeas corpus application.[32]   One of Petitioner's trial attorneys furnished the state habeas trial court with an affidavit in which he stated in pertinent part (1) he did not request a pretrial hearing

---

[31] Amended Petition, at pp. 63-82.

[32] SHCR, at pp. 89-108.

on the admissibility of Dr. Coons' testimony on future dangerousness because (a) he established Dr. Coons had interviewed Petitioner, (b) based on his experience as a trial attorney in Travis County he believed Dr. Coons would be qualified by the trial court to testify as an expert on future dangerousness, and (c) he did not want to tip off Dr. Coons through pretrial questioning as to the line of questioning he planned to use during cross-examination at trial, (2) he believed nothing would be gained by having a hearing on Dr. Coons' qualifications, and (3) he chose instead to cross-examine Dr. Coons in a way which emphasized Dr. Coons (a) had met with Petitioner only once, (b) had not reviewed Petitioner's jail and prison records showing Petitioner's demonstrated record of good behavior behind bars, (c) had no knowledge of Petitioner ever refusing to take medications.[33]

The state habeas trial court found (1) Petitioner made no constitutional challenge to the admission of Dr. Coons' testimony on future dangerousness, (2) Dr. Coons interviewed Petitioner at length and reviewed Petitioner's available medical records to formulate his opinion, (3) Dr. Coons relied on a regularly employed methodology to arrive at his opinion regarding Petitioner's future dangerousness, (4) Petitioner's own expert, Dr. Robert Cantu testified the recurring theme in Petitioner's medical, criminal, and other records is one of alcohol and drug abuse, (5) Dr. Cantu testified Petitioner would be a danger to others in prison if Petitioner had access to large quantities of drugs or alcohol, an opportunity to harm weaker people, and an unstructured environment without direct supervision, and (6) A.P. Merillat reliably testified inmates in the Texas prisons have access to alcohol and drugs and violence occurs inside Texas

---

[33] Affidavit of Tom Weber, SHCR, at pp. 1217-18.

prisons.[34]  The state habeas trial court concluded (1) Petitioner procedurally defaulted on this claim by failing to timely object to the admission of Dr. Coons' testimony on Petitioner's future dangerousness, (2) prediction of future dangerousness is a legitimate subject of expert testimony by a forensic psychiatrist, (3) Dr. Coons' testimony on future dangerousness was relevant, scientifically reliable, and admissible, and (4) Petitioner failed to show the outcome of his trial would have been different had Dr. Coons' testimony not been admitted.[35]  The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions when it denied Petitioner's first state habeas corpus application.  *Ex parte Paul Gilbert Devoe*, WR-80,402-01, 2014 WL 148689, at *1.

C.      Clearly Established Federal Law

The Supreme Court made clear in *Barefoot v. Estelle*, 463 U.S. 880 (1983), the admissibility of expert testimony regarding future dangerousness in capital murder trial was not subject to debate among reasonable jurists:

> The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel. In the first place, it is contrary to our cases.  If the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty, which it is, *Jurek v. Texas,* 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976), and if it is not impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.  In *Jurek,* seven Justices rejected the claim that it was impossible to predict future behavior and that dangerousness was therefore an invalid consideration in imposing the death penalty. Justice STEVENS responded directly to the argument, 428 U.S., at 274–276, 96 S. Ct., at 2957–2958:

---

[34]  SHCR, at pp. 1283-84.

[35]  SHCR, at pp. 1284-85.

41

"It is, of course, not easy to predict future behavior.  The fact that such a determination is difficult, however, does not mean that it cannot be made.  Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.   The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct.   Any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.  For those sentenced to prison, these same predictions must be made by parole authorities.   The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice.  What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.   Texas law clearly assures that all such evidence will be adduced."

Although there was only lay testimony with respect to dangerousness in *Jurek,* there was no suggestion by the Court that the testimony of doctors would be inadmissible.  To the contrary, the Court said the jury should be presented with all of the relevant information.  Furthermore, in *Estelle v. Smith,* 451 U.S. 454, 473, 101 S. Ct. 1866, 1878, 68 L. Ed. 2d 359 (1981), in the face of a submission very similar to that presented in this case with respect to psychiatric testimony, we approvingly repeated the above quotation from *Jurek* and went on to say that we were in "no sense disapproving the use of psychiatric testimony bearing on future dangerousness." See also *California v. Ramos,* 463 U.S. 992, 1003, 1007-08, n. 17, 103 S. Ct. 3446, 3455, 3457, n. 17, 75 L. Ed. 2d 1171 (1983); *Gregg v. Georgia,* 428 U.S. 153, 203–204, 96 S. Ct. 2909, 2939, 49 L. Ed. 2d 859 (1976) (joint opinion) (desirable to allow open and far-ranging argument that places as much information as possible before the jury).

Acceptance of petitioner's position that expert testimony about future dangerousness is far too unreliable to be admissible [sic] would immediately call into question those other contexts in which predictions of future behavior are constantly made.

*Barefoot v. Estelle,* 463 U.S. at 896-98.  The same term it decided *Barefoot,* the Supreme Court

emphasized in *California v. Ramos,* 463 U.S. 992 (1983), the importance of permitting a capital

sentencing jury to consider all relevant evidence regarding the defendant's future dangerousness.

*California v. Ramos,* 463 U.S. at 1002-03.

42

D.    AEDPA Review

In his third claim herein, Petitioner argues the Supreme Court's opinion regarding the general standards for the admission of expert testimony set forth in *Daubert v. Merrell Dow Pharma., Inc.,* effectively overruled its holding in *Barefoot* permitting the admission of expert testimony regarding future dangerousness at the sentencing phase of a capital murder trial. The same argument was "fairly presented" to the Texas Court of Criminal Appeals and rejected by that state appellate court on the merits in the course of Petitioner's direct appeal.

Insofar as Petitioner argues in his third claim that Dr. Coons' testimony was inadmissible pursuant to Rule 702 and other provisions of the Texas Rules of Evidence, that contention simply does not warrant federal habeas corpus relief. *See Little v. Johnson*, 162 F.3d 855, 862-63 (5th Cir. 1998) (emphasizing a federal habeas court does not sit to review the admissibility of evidence under state law and holding admissible expert opinion testimony regarding future dangerousness premised upon a hypothetical question), *cert. denied*, 526 U.S. 1118 (1999). Furthermore, in the course of Petitioner's direct appeal, the Texas Court of Criminal Appeals expressly rejected Petitioner's state-law argument, holding the state trial court's admission of Dr. Coons' expert testimony was proper under state law and not harmful to Petitioner as Dr. Coons' opinions merely echoed those of Petitioner's own expert Dr. Cantu. *Devoe v. State*, 354 S.W.3d at 476. A state court's interpretation of state law binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009), *cert. denied*, 562 U.S. 1203 (2011); *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314 (2008).

43

Insofar as Petitioner argues in his third claim that the Supreme Court's opinion in *Daubert* overruled *Barefoot sub silentio,* that contention has been rejected repeatedly, both expressly and implicitly, by the Fifth Circuit. *See Roberts v. Thaler*, 681 F.3d 597, 608-09 (5th Cir.) (applying *Barefoot* in the course of rejecting an Eighth Amendment challenge to a state trial court's limitation on the scope of a mental health expert's testimony at the punishment phase of a capital trial), *cert. denied*, 133 S. Ct. 529 (2012); *United States v. Fields*, 483 F.3d 313, 343-45 (5th Cir. 2007) (applying the holding in *Barefoot* to reject a complaint about the admission of allegedly "unreliable" expert testimony regarding future dangerousness during a federal capital trial and specifically holding *Barefoot* foreclosed Fifth and Eighth Amendment arguments challenging the admissibility of expert testimony regarding future dangerousness), *cert. denied*, 552 U.S. 1144 (2008); *Guy v. Cockrell*, 343 F.3d 348, 351 n.1 (5th Cir. 2003) (denying a certificate of appealability on a complaint that the prosecution presented "fundamentally unreliable expert testimony regarding future dangerousness"); *Johnson v. Cockrell*, 306 F.3d 249, 253-55 (5th Cir. 2002) (rejecting the contention that *Daubert* overruled *Barefoot* regarding the admissibility of expert testimony on future dangerousness and holding a complaint that the defendant's trial counsel rendered ineffective assistance by failing to object to the admission of such expert testimony was so meritless as not to warrant a certificate of appealability), *cert. denied*, 538 U.S. 926 (2003). In each of the foregoing cases, decided subsequent to the Supreme Court's opinions in both *Daubert* and *Kumho Tire*, the Fifth Circuit recognized the continuing vitality of the Supreme Court's holding in *Barefoot* authorizing the admission of expert testimony regarding future dangerousness during the punishment phase of a capital trial. In so doing, the Fifth Circuit implicitly rejected those portions of the legal arguments underlying

44

Petitioner's third and fourth claims herein which Petitioner "fairly presented" to the Texas Court of Criminal Appeals in the course of Petitioner's direct appeal and first state habeas corpus proceeding. The Supreme Court's holdings in *Barefoot* and *California v. Ramos,* quoted extensively above, remain the law of the land. Petitioner's contention that *Daubert* implicitly overruled *Barefoot's* holding regarding the admissibility of expert opinion testimony regarding future dangerousness in a capital murder trial has been rejected by the Fifth Circuit consistently and does not warrant federal habeas corpus relief.[36]

E.    Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's challenge to the admissibility of Dr. Coons' testimony regarding future dangerousness in the course of both Petitioner's direct appeal and first state habeas corpus proceeding was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's trial, direct appeal, and first state habeas corpus proceeding. Petitioner's third claim herein does not warrant federal habeas corpus relief.

---

[36] For the same reasons discussed at length above in Section III.D.1., insofar as Petitioner argues Dr. Coons' opinion testimony regarding future dangerousness should have been excluded under the applicable Texas rules of evidence or Texas constitutional principles, those arguments do not furnish a basis for federal habeas corpus relief.

## V. Admission of Dr. Coons' Testimony on "Life Without Parole" Inmates

A.    The Claim

In his fifth claim herein, Petitioner argues his due process rights were violated when Dr. Coons gave unreliable opinion testimony based on an absence of personal experience regarding the motivations of inmates serving terms of life imprisonment without the possibility of parole.[37]

B.    State Court Disposition

Near the end of prosecution expert Dr. Richard E. Coons' testimony on direct at the punishment phase of Petitioner's capital murder trial, the following exchange between a prosecutor and Dr. Coons took place:

> Q:    And is it your experience that inmates who are serving a capital murder sentence of life without parole are different from other prisoners?
> A:    Yes.
> Q:    How are they different?
> A:    Well, they don't have anything to lose.  What are you going to do, you know, life without parole.  And, I mean, what's the use of trying for something.  And if they are ever placed in a more secure environment, that means they have already committed an act of violence.
> Q:    Dr. Coons, you were in the courtroom yesterday when Dr. Cantu testified?
> A:    I was.
> Q:    And I believe it was his testimony that if the defendant had access to alcohol or drugs in prison and the opportunity and access to someone that was perhaps weaker than himself and in a situation such as the general prison population where there is a lack of structure, that he would be a continuing threat to society?
> A;    I'd agree with him.  I agree.
> Q:    Do you agree with his testimony?
> A:    Yes.
> Q:    And what is your opinion about the defendant's probability that he would commit future acts of violence that would constitute a continuing threat to society?
> A:    I believe there is a probability that he would.[38]

---

[37] Amended Petition, at pp. 95-111.
[38] Testimony of Dr. Richard E. Coons, RR, Volume 28, at pp. 37-38; SHCR, at p. 2647.

Petitioner raised the same complaint about the admission of Dr. Coons' testimony regarding inmates serving terms of life without parole as his fifth claim in his first state habeas corpus application.[39]  The state habeas trial court found (1) Dr. Coons' testimony regarding the lack of motivation of inmates serving terms of life without parole to behave went unchallenged at trial, (2) the only evidence Petitioner presented to support his allegation that Dr. Coons lacked experience with inmates serving life without parole was the fact that, at the time of Petitioner's trial, life without parole had only been a sentencing option in Texas for four years, and (3) Petitioner never challenged Dr. Coons' assertion that he had such experience at trial.[40]  The state habeas trial court concluded (1) Petitioner's failure to object in a timely and specific manner during trial failed to preserve his complaint about the admission of this portion of Dr. Coons' testimony, (2) Petitioner failed to preserve his complaint about this aspect of Dr. Coons' testimony, (3) Petitioner's complaint is procedurally barred, (4) Dr. Coons' testimony on this point was relevant, reliable, and admissible, and (5) Petitioner failed to show the outcome of his trial would have been different had this portion of Dr. Coons' testimony not been admitted.[41]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions when it denied Petitioner's first state habeas corpus application.  *Ex parte Paul Gilbert Devoe*, WR-80,402-01, 2014 WL 148689, at *1.

---

[39] SHCR, at pp. 119-33.

[40] SHCR, at p. 1290.

[41] SHCR, at pp. 1290-91.

C.    Procedural Default

The Texas contemporaneous objection rule, upon which the state habeas court relied in this case in rejecting Petitioner's challenge to the admission of Dr. Coons' opinion regarding the motivations of prisoners serving a term of life without parole, is an adequate and independent state ground that procedurally bars federal habeas review. *See Norris v. Davis*, ___ F.3d ___, ___, 2016 WL 3418412, *7 (5th Cir. June 21, 2016) (failure to object to prosecutor's allegedly improper jury argument foreclosed federal habeas review of complaint); *Allen v. Stephens*, 805 F.3d 617, 635 (5th Cir. 2015) ("[W]e have consistently upheld Texas's contemporaneous objection rule as an independent and adequate state ground that procedurally bars federal habeas review of a petitioner's claims." (internal quotation marks and alterations omitted)), *cert. denied*, 136 S. Ct. 2382 (2016); *Rowell v. Dretke*, 398 F.3d 370, 374 (5th Cir.) (holding the same), *cert. denied*, 546 U.S. 848 (2005). Petitioner procedurally defaulted on this claim by failing to raise any contemporaneous challenge to the admission of this aspect of Dr. Coons' testimony.[42]

D.    Alternatively, No Merit to Constitutional Challenge

The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions, including the state habeas trial court's determination that Dr. Coons' testimony on this point was relevant, reliable, and admissible.[43] As explained above, the state habeas court's application of state evidentiary rules binds this Court on federal habeas review. *See Garza v.*

---

[42] As explained below, the failure of Petitioner's trial counsel to object in a timely manner to this aspect of Dr. Coons' testimony did not prejudice Petitioner within the meaning of *Strickland* analysis so as to create an exception to the procedural default doctrine.

[43] SHCR, at p. 1291.

*Stephens*, 738 F.3d 669, 677 (5th Cir. 2013) ("The Texas habeas court's interpretation of Texas evidentiary rules is therefore binding in this case."), *cert. denied*, 134 S. Ct. 2876 (2014).[44]

Furthermore, in reviewing state evidentiary rulings in habeas corpus petitions, a federal court does not sit as super state supreme court to review error under state law. *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988). It is not the province of a federal habeas court to reexamine state court determinations on state-law questions such as the admissibility of evidence under state procedural rules. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Goodrum v. Quarterman*, 547 F.3d 249, 261 (5th Cir. 2008), *cert. denied*, 556 U.S. 1130 (2009). A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair. *Brown v. Epps*, 686 f3d 281, 286 n.20 (5th Cir. 2012); *Goodrum v. Quarterman*, 547 F.3d at 261. "A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999); *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993), *cert. denied*, 510 U.S. 1025 (1993). The challenged evidence must be a crucial, critical, or highly significant factor in the context of the entire case. *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011); *Jackson v. Johnson*, 194 F.3d 641, 656 (5th Cir. 1999), *cert. denied*, 529 U.S. 1027 (2000). The test to determine whether a trial error makes a trial "fundamentally unfair" is whether there is a reasonable probability that

---

[44] Moreover, for the same reasons discussed at length above in Section III.D.1., insofar as Petitioner argues Dr. Coons' opinion regarding the motivations of inmates serving terms of life without parole to comply with prison rules or otherwise behave themselves should have been excluded under the applicable Texas rules of evidence or Texas constitutional principles those arguments do not furnish a basis for federal habeas corpus relief.

the verdict might have been different had the trial been properly conducted. *Brown v. Dretke*, 419 F.3d 365, 377 (5th Cir. 2005), *cert. denied*, 546 U.S. 1217 (2006); *Guidroz v. Lynaugh*, 852 F.2d 832, 835 (5th Cir. 1988). Due process is implicated only for rulings of such a magnitude or so egregious that they render the trial fundamentally unfair; it offers no authority to federal habeas courts to review the run-of-the-mill evidentiary rulings of state trial courts. *Gonzales v. Thaler*, 643 F.3d at 430. A "fundamentally unfair" trial is one largely robbed of dignity due a rational process. *Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir. 1984).

The admission of Dr. Coons' allegedly unsubstantiated opinion that inmates serving terms of life imprisonment without the possibility of parole have little motivation to comply with prison rules did not render the punishment phase of Petitioner's trial fundamentally unfair.[45] By the time Dr. Coons testified, Petitioner's trial counsel had already elicited on cross-examination an admission from prosecution expert A.P. Merillat that the TDCJ's prison disciplinary system is designed to encourage inmates to comply with prison rules and that records of an inmate's

---

[45] Petitioner argues that because the State of Texas adopted the capital sentencing option of life imprisonment without the possibility of parole only four years prior to Petitioner's capital murder trial, Dr. Coons could not possibly have possessed any experience dealing with inmates serving terms of life imprisonment without the possibility of parole. The question directed to Dr. Coons, however, was not limited to his experience with Texas state inmates. While Petitioner alleged in conclusory fashion in the state habeas court and in this Court that, at the time of Petitioner's trial, Dr. Coons had no experience working with inmates from jurisdictions other than the State of Texas who were serving terms of life imprisonment without the possibility of parole, Petitioner furnished the state habeas court with no specific facts and no evidence from any person possessing personal knowledge of Dr. Coons' professional experience vis-a-vis inmates serving terms of life imprisonment without the possibility of parole. Mere speculation about operative facts does not suffice to satisfy the "clear and convincing evidence" standard for overcoming the presumption of validity afforded a state court's factual findings in the context of a federal habeas corpus proceeding. *Gutierrez v. Dretke*, 392 F.Supp.2d 802, 836 (W.D. Tex. 2005), *CoA denied*, 201 F. App'x 196 (5th Cir. Sept. 21, 2006), *cert. denied*, 549 U.S. 1227 (2007). Moreover, as courts have explained in a somewhat related context: "Unsubstantiated assertions are not competent summary judgment evidence; summary judgment is appropriate where the nonmovant relies upon conclusory allegations, improbable inferences, and unsupported speculation. Conjecture and unverified assertions made before the Court are not a specific showing of solid evidence to shield one from summary judgment." *Hick v. Bexar Cty., Tex.*, 973 F. Supp. 653, 666 (W.D. Tex. 1997) (Footnotes omitted), *aff'd sub nom. Hicks v. Bexar Cty.*, 137 F.3d 1352 (5th Cir. 1998).

disciplinary infractions are maintained.[46]  Likewise, by the time Dr. Coons' testified, Petitioner's own expert Dr. Cantu had testified that, given access to alcohol or drugs, the presence of a weaker person to victimize, and an unstructured environment such as exists in the TDCJ's general population, Petitioner could pose a risk of future dangerousness.[47]  Records and testimony concerning Petitioner's previous periods of incarceration and detention, during which he displayed exemplary behavior, addressed conduct which took place several years before Petitioner murdered six people in three different locations with ruthless efficiency and then blamed his ex-girlfriend for his criminal conduct.  The alleged erroneous admission of Dr. Coons' opinion regarding the motivations of inmates serving terms of life imprisonment without the possibility of parole, even if based solely upon his experience dealing with prisoners generally and not on particular experience dealing with prisoners serving such terms, did not render the punishment phase of Petitioner's capital murder trial fundamentally unfair.

---

[46]  Testimony of A.P. Merillat, RR Vol. 27, at pp. 67-68; SHCR, at p. 2584.

[47]  During cross-examination, Petitioner's expert Dr. Robert Cantu testified in part as follows:
  Q:  If he had the freedom and the lack of supervision, then he may be a threat in prison, correct?
    A:  Right.  Yes, I would agree with that.
    Q:  And then also the other thing that I understood that you said was the lack of structure?
    A:  Lack of structure, yes.
    Q:  So in prison he would have more structure and that would prevent him from being a danger, correct?
    A:  I think that would be a factor, too.
    Q:  Now, Dr. Cantu, would you agree with me that if indeed he had access to large quantities of alcohol or drugs while in prison and that he had the opportunities to assault people in prison and that if the prison structure was such that there was an absence of structure, that is, he could go places without having direct  supervision while in prison, that under those different circumstances, the converse circumstances, that he would be a danger to others in the prison society, would you agree - -
    A:  Yes, sir.
    Q:  You would agree with that?
    A:  Yes, sir.
Testimony of Robert Cantu, RR Vol. 27, at pp. 245-46; SHCR, at p. 2629.

E.      Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during the course of Petitioner's first state habeas corpus proceeding of Petitioner's complaint about the admission of Dr. Coons' testimony regarding the motivations of inmates serving terms of life imprisonment without the possibility of parole was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding. Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

## VI. **Petitioner's Alleged Incompetence During His State Habeas Proceeding**

A.      The Claim

In his ninth claim herein, Petitioner argues he was mentally incompetent during his initial state habeas corpus proceeding and unable to assist his state habeas counsel, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[48]

---

[48]  Amended Petition, at pp. 295-311. Petitioner also argues he is currently mentally incompetent and unable to assist his federal habeas corpus counsel, thus warranting issuance of a stay of this cause. This Court rejected this request in an Order issued May 15, 2015 (ECF no. 34), which is hereby incorporated by reference herein. The Supreme Court rejected the premise underlying Petitioner's request for stay and abeyance of this federal habeas corpus proceeding in *Ryan v. Gonzales*, 133 S. Ct. 696 (2013), holding there is no statutory right to competence during the pendency of a federal habeas corpus proceeding. For the reasons discussed in this Court's Order issued May 15, 2015 (ECF no. 34), Petitioner does not possess a federal constitutional right to a stay of this cause pending a determination of his current mental competency. The claims presented in Petitioner's Amended Petition address matters of historical fact set forth in the records from Petitioner's state trial, direct appeal, and state habeas corpus proceedings. Claims denied on the merits in Petitioner's direct appeal or state habeas corpus proceedings (as were virtually all of Petitioner's claims in this federal habeas corpus proceeding) may not be factually re-litigated in this Court through the admission of new evidence. *See Allen v. Stephens*, 805 F.3d 617, 625 (5th Cir. 2015) ("the federal court's review is limited to 'the evidence presented in the state court proceeding.'" (citing § 2254(d)(2) and *Cullen v. Pinholster*, 563 U.S. 170 (2011) (limiting review under § 2254(d)(1) to the record before the state court that adjudicated the claim on the merits)), *cert. denied*, 136 S. Ct. 2382 (2016). This Court can fully resolve all of Petitioner's claims herein based upon the record now before this Court without the necessity of further evidentiary development.

B.    <u>State Court Disposition</u>

Petitioner presented a similar claim in his second application for state habeas corpus relief, which the Texas Court of Criminal Appeals summarily dismissed under the Texas writ-abuse statute, i.e., Article 11.071, § 5 of the Texas Code of Criminal Procedure. *Ex parte Paul Gilbert Devoe*, WR-80,402-02, 2016 WL 157980, *1 (Tex. Crim. App. Jan. 13, 2016).

C.    <u>Procedural Default</u>

The Fifth Circuit has long recognized dismissal of claims under the Texas writ-abuse statute as an independent and adequate barrier to federal habeas review.  *See Canales v. Stephens*, 765 F.3d 551, 566 (5th Cir. 2014) ("the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar." (quoting *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009)); *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014) (holding the same), *cert. denied*, 135 S. Ct. 435 (2014); *Cotton v. Cockrell*, 343 F.3d 746, 755 (5th Cir. 2003) (holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review), *cert. denied*, 540 U.S. 1186 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 605 (5th Cir. 2003) (recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied*, 540 U.S. 1163 (2004).

D.    <u>Alternatively, No Merit</u>

Petitioner's complaint that he was mentally incompetent during his state habeas corpus proceeding and, therefore, unable to assist his state habeas corpus counsel fails to state an arguable basis for federal habeas corpus relief.  Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas corpus relief. *Henderson v. Stephens*, 791 F.3d 567,

578 (5th Cir. 2015), *cert. filed Feb. 3, 2016 (no. 15-7974)*; *Ladd v. Stephens*, 748 F.3d 637, 644 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 192 (2014); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2876 (2014). This is because an attack upon the state habeas proceeding is an attack on a proceeding that is collateral to the underlying basis of the petitioner's detention and does not challenge the validity of the detention itself. *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004); *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir.), *cert. denied*, 534 U.S. 1001 (2001).

E.    Conclusions

Petitioner's complaint that he was incompetent during his state habeas corpus proceeding is procedurally defaulted and, even when reviewed de novo, does not furnish a basis for federal habeas corpus relief. Petitioner's request for a stay of this federal habeas corpus proceeding based upon his alleged current mental incompetence does not furnish a basis for federal habeas corpus relief since it does not attack the validity of Petitioner's otherwise final state criminal conviction and sentence. The Court does not need further factual or evidentiary development to resolve Petitioner's claims herein pursuant to the AEDPA's standard of review. Hence Petitioner is not entitled to a stay under the standard set forth in *Rhines v. Weber*, 544 U.S. 269 (2005), based upon Petitioner's purported current incompetence. Petitioner's personal involvement is unnecessary at this juncture for this Court to resolve the claims presented by Petitioner in his Amended Petition, all of which turn on the legal analysis of matters of historical fact. Under such circumstances, Petitioner is not entitled to a stay of this federal habeas corpus proceeding. Petitioner's ninth claim does not warrant federal habeas corpus relief.

## VII. <u>The Prosecution Threw Ammunition into the Jury Box</u>

A.   <u>The Claim</u>

In his twelfth claim for relief in his Amended Petition, Petitioner argues his right to a fair trial was violated when the prosecutor threw live ammunition into the jury box during closing argument at the punishment phase of trial.[49]

B.   <u>State Court Disposition</u>

In his third point of error on direct appeal, Petitioner argued the state trial court erred in denying his motion for new trial after the prosecutor threw two boxes of live ammunition into the jury box (thereby endangering the jurors) and waved a gun around during closing argument at the punishment phase of trial.[50]   The Texas Court of Criminal Appeals opinion on direct appeal accurately recounts the relevant events as follows:

> In his third point of error, Appellant contends that the trial court "erred in failing to grant [him] a new trial, where prosecutor Gary Cobb threw one or more boxes of live rounds of ammunition into the jury box prior to the jury retiring to consider punishment." The record shows that after the jury retired to begin its deliberations, the following occurred:
> > MR. WEBER [Defense Counsel]: All right. We're going to object to Mr. Cobb's conduct during early in the presentation—early in the closing. He picked up live rounds, not shells, and poured— from about a foot high poured—where is [Mr. Erickson, defense counsel]—I would say 50 rounds of ammunition on the bench directly in front of the jurors.
> > And how many are in the jury box right now?
> > MR. ERICKSON: About 12.
> > MR. WEBER: There's 12 rounds that actually went into the jury box, live rounds.

---

[49] Amended Petition, at pp. 320-24.

[50] First Amended Brief on Appeal, at pp. 18-20.  In support of his third point of error on direct appeal, Petitioner's state appellate brief included no citations to case law, statutes, or any other legal authority other than the ABA Standards for Prosecution Function addressing the professionalism demanded of officers of the court.

How many are on the bench in front of them?

MR. ERICKSON: 15.

MR. WEBER: There's 15 on the bench in front of them.

He poured live rounds in front of the jury. He then walked over and held the gun out to [Appellant] and offered the gun to [Appellant]. He then brought records that I introduced that were in the record and slammed them down on the table directly in front of me.

All of these actions violated the specific rules the judge told us and proper conduct. [The judge] gave us the rules. We all acknowledged we heard it. Absolutely improper. Absolutely outrageous conduct. Absolutely uncalled for.

We have no problem with anything that was said against us, but this conduct was just completely outside the bounds of what is permitted in the law. We ask, one, that Mr. Cobb be held in contempt of court; and we ask, two, for a mistrial.

THE COURT: Counsel has requested that that be placed on the record. And, State, if you wish to reply as well on the record, you may do so.

MR. COBB: Only to dispute Mr. Weber's accusation that I offered the gun to [Appellant]. I did not offer the gun to [Appellant]. I walked toward counsel ['s] table with the gun. And I don't believe that I slammed the records down. I did put them on counsel['s] table.

The trial court declined to hold the prosecutor in contempt and denied Appellant's motion for mistrial.

*Devoe v. State*, 354 S.W.3d at 471–72.[51]

---

[51] For the sake of completeness, this Court points out that, immediately before the exchange quoted at length above by the Texas Court of Criminal Appeals, the state trial court reveals the jury retired and then Petitioner's trial counsel approached the judge to discuss the matter:

MR. WEBER: I want to put something on the record. I want the record to indicate, because there is no photographs [sic], that during Mr. Cobb's closing argument – early in the closing argument he picked up live rounds of ammunition. These are live rounds and he picked them up and he dropped them on the bench directly in front of the jurors. I would say he was holding it, you could argue, a foot high. Some of these rounds actually fell into the jury box where the jurors were. He then took the gun and went over probably about five feet from Paul Devoe, held the gun out and offered the gun to Paul Devoe. He also took –

THE COURT: I think Mr. Cobb should be up here. Mr. Cobb. I think it is probably appropriate that you respond.

MR. WEBER: You want me to reiterate?

THE COURT: Yes, if you would start over.

RR Vol. 29, at pp. 94-95; SHCR, at p. 2703.

The Texas Court of Criminal Appeals found Petitioner did not object to the prosecutor's conduct or request an instruction to disregard when the conduct occurred but instead moved for a mistrial after the jury had already retired. *Id.*, at 472. That court concluded Petitioner failed to object at the earliest opportunity and, therefore, presented nothing for appellate review. *Id.*

C.    Procedural Default

For the same reasons discussed in Section V.C. above, Petitioner's failure to comply with the Texas contemporaneous objection rule constitutes a procedural barrier to this Court's federal habeas review of this claim. Petitioner does not allege his trial counsel rendered ineffective assistance by failing to timely object to the prosecutor's histrionics. Nor could Petitioner reasonably do so. Petitioner's state trial counsel furnished the state habeas court with an uncontroverted affidavit in which he explained that he failed to object to the prosecutor's actions during closing argument in front of the jury because (1) he did not believe the trial court would grant a mistrial at that late stage of the capital murder trial, (2) having his motion or objection overruled or denied in front of the jury could diminish the potentially beneficial impact to the defense of the prosecutor's boorish behavior, (3) he believed the prosecution was baiting him with his outrageous behavior, attempting to get him to object, possibly creating resentment toward him in the jury, and giving the prosecutor something to comment upon during his closing argument - especially since the prosecution had not objected during the defense's closing argument, and (4) based upon his experience, he believed the prosecutor's boorish behavior could benefit the defense during deliberations.[52] Petitioner offered the state habeas court no controverting affidavit of other evidence and dropped his assertion of ineffective assistance

---

[52] Affidavit of Tom Weber, SHCR, at p. 1224.

based upon Weber's failure to timely object to the prosecutor's boorish behavior when Petitioner filed his Amended Petition in this Court.

D.    Alternatively, No Merit

Prosecutorial misconduct during closing argument warrants federal habeas relief only when it violates a specific constitutional guarantee or renders a trial fundamentally unfair:

> Improper remarks by a prosecutor "are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair." *Harris v. Cockrell,* 313 F.3d 238, 245 (5th Cir.2002). "Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or ... the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Id.* at 245 (internal quotation marks and citation omitted). "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation marks and citation omitted). A curative instruction may reduce the risk of prejudice to the defendant. *See Ward v. Dretke,* 420 F.3d 479, 499 (5th Cir.2005).

*Hughes v. Quarterman*, 530 F.3d at 347.

In this case, it is undisputed Petitioner's trial counsel deliberately chose not to object in the jury's presence to the prosecutor's histrionics for strategic reasons - because he believed the prosecutor's behavior could benefit the defense during jury deliberations.   In addition, the evidence of Petitioner's propensity for violence and lack of remorse over his crimes was amply demonstrated.    While Petitioner's trial counsel presented extensive evidence showing Petitioner's record for good behavior while in prison or jail on previous occasions, that evidence was countered at the punishment phase of trial with testimony showing Petitioner committed numerous violent criminal offenses which led to his prior incarcerations and detentions.   The level of violence in Petitioner's series of offenses was extraordinary even when judged against other capital murders.   Petitioner brutally murdered a total of six people at three different

locations.   One of his victims was an elderly female stranger and two were mere teenagers. Petitioner's written confession to his murder of Betty Dehart in Pennsylvania was introduced into evidence during the punishment phase of trial as State Exhibit 118 and furnished a chilling account of how he (1) carefully selected her to be his victim so he could take her car and (2) terrorized and fatally shot her without ever simply asking her for her car keys.   Even Petitioner's own mental health expert Dr. Cantu admitted before the jury that, given access to drugs or alcohol, a lack of direct supervision, and access to vulnerable individuals, Petitioner could pose a danger to others in a prison setting.   When finally arrested in New York, Petitioner blamed his ex-girlfriend for his legal woes.   Under such circumstances, the prosecutor's melodramatic gestures and actions during closing argument did not render the punishment phase of Petitioner's capital murder trial fundamentally unfair.   Petitioner's trial counsel very reasonably believed such boorish behavior could offend the jury and help the defense.

E.    Conclusions

Petitioner procedurally defaulted on his complaints about the conduct of the prosecution during closing arguments at the punishment phase of trial by failing to timely object to same. The prosecutor's boorish behavior did not render the punishment phase of Petitioner's capital murder trial fundamentally unfair.   The evidence supporting the jury's answers to the Texas capital sentencing special issues favorable to the prosecution was overwhelming.

Petitioner's primary attempt to reduce his moral culpability during the punishment phase of his trial consisted of testimony and expert opinions showing Petitioner had a long history of drug and alcohol abuse and was intoxicated at the time of his offenses.   The jury could reasonably have discounted Petitioner's self-serving assertions that he was suffering the effects

of massive alcohol and methamphetamine intoxication during his extended crime spree, however.   Viewed in the light most favorable to the jury's verdict, the evidence at the punishment phase of trial showed Petitioner (1) murdered five of his victims with a single fatal shot each (thus negating the suggestion he was impaired at the time he fired those shots), (2) managed to wrestle off an attacker and make his escape after his first murder in Marble Falls despite the fact he committed that offense in a building adjacent to the town's police headquarters, (3) managed to drive a not inconsiderable distance to the home of Paula Griffith, murder four more people, and make his escape in Griffith's vehicle without alerting anyone in the immediate vicinity,[53] (4) drove from central Texas to Pennsylvania without attracting the attention of highway patrol officers along the way with his impaired driving skills,[54] (5) carried on multiple coherent and lucid telephone conversations with his friend Bill Brinlee the night of the first five murders during that drive,[55] (6) ruthlessly murdered an elderly Pennsylvania woman to get her car without first asking her for her car keys, (7) drove from Pennsylvania to Long Island to the home of a friend again without attracting any attention from law enforcement officers engaged in routine patrol of the highways between those two points, and (8) when he arrived in New York and was subsequently arrested, Petitioner displayed a remarkably calm demeanor and blamed his ex-girlfriend for his legal woes.

---

[53] Dr. Coons described Petitioner's behavior during the crime spree at evidencing an ability to react to stimuli and make plans.  Testimony Richard Coons, RR Vol. 28, at pp. 25-27; SHCR, at p. 2644.

[54] Dr. Coons related to the jury that Petitioner had described to him the care Petitioner took to avoid getting caught speeding during his cross-country drive.  Testimony of Richard Coons, RR Vol. 28, at p. 25, SHCR, at p. 2644.

[55] Testimony of Bill Brinlee, RR Vol. 21, at pp. 83-123.  Brinlee also testified Petitioner admitted he went to the bar in Marble Falls for the specific purpose of killing his former girlfriend and stated he was going after both her and her father.  *Id.*, at pp. 109 & 121.

Furthermore, one of Petitioner's mental health experts, Dr. Robert Cantu, testified that, despite Petitioner's assertions that he was suffering from acute alcohol and methamphetamine intoxication (and "out of his mind") at the time of his murder spree, Petitioner was able to furnish a highly detailed account of his murders of four people at the home of Paula Griffith.[56] Petitioner's jury could reasonably have concluded Petitioner's self-serving assertion that he was suffering from methamphetamine and alcohol intoxication at the time of his crime spree was simply not credible, thus undermining a substantial portion of the defense's potentially mitigating evidence.  One of the witnesses who knew Petitioner personally and testified during the punishment phase of Petitioner's capital murder trial described him as highly manipulative - "smooth," the kind of person who could talk the shirt off your back.[57]  Dr. Coons described Petitioner as impulsive, antisocial, and admitting he preferred street drugs to medication designed to treat his medical problems.[58]  Petitioner's jury could have reasonably discounted Petitioner's assertions he was intoxicated during his crime spree.   The prosecution's melodramatic, even potential dangerous, behavior in front of the jury did not render the punishment phase of Petitioner's trial fundamentally unfair.  Petitioner's twelfth claim herein does not warrant federal habeas corpus relief.

---

[56] Testimony of Dr. Robert Cantu, RR Vol. 27, at pp. 252-56.

[57] Testimony of Alton Parker, RR Vol. 26, at p. 45.  For unknown reasons RR Volume 26 was not duplicated in the SHCR.

[58] Testimony of Richard Coons, RR Vol. 28, at pp. 19, 28, 30-31, 35- 36; SHCR, at pp. 2642, 2645-46.

### VIII. *Batson* Claim Based on the Exclusion of Roman Catholic Venire Members

A.    The Claim

In his thirteenth claim, Petitioner argues his constitutional rights were violated when the prosecution employed its peremptory strikes to exclude Roman Catholic venire members from Petitioner's petit jury.[59]

B.    State Court Disposition

Petitioner presented basically the same complaint as his fourth point of error on direct appeal.[60] The Texas Court of Criminal Appeals rejected this point of error on the merits, citing a prior holding in which it held *Batson* does not apply to the use of peremptory strikes based on religion. *Devoe v. State*. 354 S.W.3d at 472.

C.    Clearly Established Federal Law

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court extended the equal protection principle barring the purposeful exclusion of Blacks from criminal jury service to the prosecution's use of peremptory challenges during petit jury selection. *See Batson v. Kentucky*, 476 U.S. at 89 ("the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."). *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: first, the defendant must make out a prima facie case of discriminatory jury selection by the totality of the relevant facts concerning a prosecutor's

---

[59] Amended Petition, at pp. 324-27.

[60] First Amended Brief on Appeal, at pp. 20-23.

62

conduct during the defendant's own trial; second, once the defendant makes the prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging jurors within the arguably targeted class; and finally, the trial court must determine if the defendant established purposeful discrimination by the prosecution. *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008); *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005); *Batson v. Kentucky*, 476 U.S. at 94-98.

D.    AEDPA Analysis

Petitioner identifies no Supreme Court opinion applying the rule in *Batson* to bar the use of peremptory challenges based upon the religion or religious affiliation of a venire member. Nor has this Court's independent research identified any such legal authority. Accordingly, the Texas Court of Criminal Appeals' refusal to extend the rule in *Batson* to bar peremptory strikes based on religion was not in conflict with clearly established federal law.

Respondent also correctly argues this Court is precluded from recognizing the new legal theory underlying Petitioner's thirteenth claim herein in the context of this federal habeas corpus proceeding. *See Teague v. Lane*, 489 U.S. 288, 310 (1989) (holding that, unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced). Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation

63

on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *Caspari v. Bohlen*, 510 U.S. at 390.

The only exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S. at 390. Petitioner's conviction became final under this standard not later than March 14, 2012, i.e., the ninety-first day after the Texas Court of

Criminal Appeals issued its opinion affirming Petitioner's conviction and sentence. Rule 13.1, Rules of the United States Supreme Court. *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003) (recognizing the continued vitality of the *Teague* doctrine under the AEDPA), *cert. denied*, 539 U.S. 979 (2003).

As of the date Petitioner's conviction and sentence became final for *Teague* purposes, no federal court, much less the United States Supreme Court, had held the rule announced in *Batson* applied to peremptory strikes exercised based upon a potential juror's religion affiliation. Thus, unless Petitioner's proposed new rule falls within one of the exceptions to the *Teague* non-retroactivity doctrine recognized by the Supreme Court, Petitioner's thirteenth claim herein may not furnish a basis for federal habeas corpus relief.

The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157; *Fisher v. Texas*, 169 F.3d 295, 306 (5th Cir. 1999). The new rule proposed by Petitioner in his thirteenth claim herein does not fall within either of the two noted exceptions to the *Teague* doctrine. *See Fisher v. Texas*, 169 F.3d at 306:

> Neither exception applies to this case. Application of *Batson* to religion would not protect any primary conduct, nor would it implicate the fundamental fairness and accuracy of the criminal proceeding. The *Teague* Court found that neither exception applied to a similar constitutional issue of criminal procedure, i.e.,

whether the Sixth Amendment fair cross section requirement applied to the petit jury. *See* 489 U.S. at 311-16, 109 S.Ct. 1060. Furthermore, the Supreme Court declined to apply *Batson* retroactively to proceedings on collateral review in *Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). *See id.* at 259-61, 106 S.Ct. 2878 (explaining that the rule announced in *Batson* did not have "such a fundamental impact on the integrity of factfinding as to compel retroactive application"). In addition, courts have applied the *Teague* bar to subsequent extensions of *Batson,* rejecting petitioners' claims that the exceptions apply. *See, e.g., Nguyen v. Reynolds,* 131 F.3d 1340, 1351-52 (10th Cir.1997) (determining that application of *Powers v. Ohio,* 499 U.S. 400, 406, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), which held that *Batson* claims did not require racial identity between the defendant and challenged venire member, was a new rule under *Teague* and that neither exception applied), *cert. denied,* 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103 (1998); *Jones v. Gomez,* 66 F.3d 199, 204 (9th Cir.1995) (same).

E.     Conclusions

The Texas Court of Criminal Appeals' rejection on the merits in the course of Petitioner's direct appeal of Petitioner's *Batson* claim premised upon religion was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's trial and direct appeal. Petitioner's thirteenth claim is barred by the non-retroactivity principle announced in *Teague.* Petitioner's thirteenth claim does not warrant federal habeas relief.

## IX. Ineffective Assistance by Trial Counsel

A.     Overview of the Claims

In his second, fourth, sixth, seventh, and eighth claims herein, Petitioner argues his trial counsel rendered ineffective assistance by failing to (1) exclude or impeach the testimony of A.P. Merillat,[61] (2) challenge the admissibility of Dr. Coons' testimony on future dangerousness under

---

[61] Amended Petition, at pp. 51-63.

the Texas Rules of Evidence,[62] (3) challenge the reliability and admissibility of Dr. Coons' testimony on the motivations inmates serving life without parole,[63] (4) adequately investigate Petitioner's background and present available mitigating evidence, and (5) impeach prosecution witness Stephen Barr.[64]

B.      Clearly Established Federal Law

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

---

[62] Amended Petition, at pp. 83-95.

[63] Amended Petition, at pp. 95-111.

[64] Amended Petition, at pp. 290-94.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. at 7; *Strickland v. Washington*, 466 U.S. at 688-89. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v. Washington*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. at 694.

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review.  The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 134 S. Ct. 10, 16 (2013).  Under § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015); *White v. Woodall,* 134 S. Ct. 1697, 1702 (2011); *Harrington v. Richter,* 562 U.S. 86, 103 (2011).  "Viewing the *Strickland* test from the narrow perspective afforded federal courts by AEDPA results in even greater deference to the state courts' judgment." *Williams v. Stephens*, 761 F.3d 561, 567 (5th Cir. 2014), *cert. denied,* 135 S. Ct. 1735 (2015).

> When a petitioner brings a *Strickland* claim under AEDPA, the "pivotal question" is not whether the petitioner was deprived of his right to counsel under the Sixth Amendment.  Instead, "the question is whether the state court's application of the *Strickland* standard was unreasonable."  Both the *Strickland* standard and AEDPA standard are "highly deferential," and "when the two apply in tandem, review is doubly so."

*Beatty v. Stephens*, 759 F.3d 455, 463 (5th Cir. 2014) (citations omitted), *cert. denied,* 135 S. Ct. 2312 (2015).

Thus, in evaluating Petitioner's complaints about the performance of his trial counsel which the state courts rejected on the merits, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded Petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis.  *Schaetzle v.*

*Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004).  In making this determination, this Court must consider the underlying *Strickland* standard.  *Id.*

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo*.  *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence.  *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, 558 U.S. 839 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009).  Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland v. Washington*, 466 U.S. at 690.

C.    Failure to Exclude or Impeach Merillat's Testimony

    1.    The Claim Restated

In his second claim herein, Petitioner argues his trial counsel rendered ineffective assistance by failing to (1) file a motion in limine regarding the testimony of A.P. Merillat, (2) seek to limit Merillat's testimony by excluding anecdotal details, (3) independently investigate Merillat's background, (4) contact the SPU, (5) contact Texas Defender Service to obtain copies of Merillat's testimony in prior death penalty cases, (6) review Merillat's testimony in prior cases, (7) obtain statistics regarding violence in prison to impeach Merillat, and (8) obtain information showing Merillat was paid "extra" to testify at Petitioner's trial.[65]

    2.    State Court Disposition

Petitioner presented somewhat similar complaints as his second claim for relief in his first state habeas corpus application.[66]  Petitioner's former lead trial counsel, attorney Tom Weber, furnished the state habeas trial court with a detailed affidavit which stated in pertinent part that (1) the defense team hired Larry Fitzgerald, a former public information officer for TDCJ, to assist in preparation for Merillat's trial testimony and to help formulate a strategy for addressing Merillat's expected testimony, (2) Fitzgerald had testified many times in death penalty cases in rebuttal to Merillat's expert testimony, (3) Fitzgerald testified at Petitioner's trial regarding the TDCJ's prisoner classification system and the steps which the TDCJ would routinely take to restrict the conduct of an inmate convicted of capital murder and sentenced to serve a term of life imprisonment without the possibility of parole, (4) Fitzgerald assisted

---

[65] Amended Petition, at pp. 51-63.

[66] SHCR, at pp. 52-88.

defense counsel (attorney Weber and co-counsel John Erickson) in their preparation for cross-examining Merillat, accurately predicted the expected testimony Merillat would give, and discussed strategies for countering Merillat's testimony, and (5) co-counsel Erickson effectively cross-examined Merillat at trial.[67]   The state habeas trial court found (1) in anticipation of Merillat's trial testimony, the defense retained Fitzgerald's services, (2) Fitzgerald has extensive experience testifying in rebuttal to Merillat in capital murder trials, and (3) the defense team learned through Fitzgerald how Merillat would testify and developed strategies to rebut Merillat and expose incorrect statements by Merillat.[68]   The state habeas trial court concluded (1) defense counsel reasonably chose to employ testimony by Fitzgerald to rebut Merillat, (2) Merillat's testimony was relevant and admissible on the subject of future dangerousness, (3) Petitioner's trial counsel were not ineffective in failing to object or seek to exclude Merillat's trial testimony, and (4) defense counsel were not ineffective for failing to object to admissible testimony.[69]   The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions when it denied Petitioner's first state habeas corpus application.

> 3.   AEDPA Analysis

>> a.   No Deficient Performance

The state habeas court's conclusion that this ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* analysis was eminently reasonable in light of the evidence presented during Petitioner's first state habeas corpus proceeding.

---

[67] SHCR, at pp. 1213, 1216-17.

[68] SHCR, at p. 1281.

[69] SHCR, at pp. 1281-82.

The state habeas court determined Merillat's trial testimony was relevant and admissible.[70] The state habeas court's application of state evidentiary rules binds this Court in federal habeas review. *Bradshaw v. Richey*, 546 U.S. at 76; *Garza v. Stephens*, 738 F.3d at 677. Petitioner's trial counsel cannot reasonably be faulted for failing to object to admissible testimony. *See Miller v. Thaler*, 714 F.3d 897, 904 n.6 (5th Cir. 2013) (counsel is not required to make futile motions or objections); *Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir.) ("the failure to lodge futile objections does not qualify as ineffective assistance" (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)), *cert. denied*, 133 S. Ct. 529 (2012); *Ward v. Dretke*, 420 F.3d 479, 498 (5th Cir. 2005) (counsel not ineffective for failing to lodge what would likely have been a futile objection), *cert. denied*, 547 U.S. 1040 (2006).

As to Petitioner's complaints about the failure of his trial counsel to investigate Merillat's background and contact the ACLU, TDS, and SPU in search for impeachment and rebuttal evidence, Petitioner failed to present the state habeas court with any evidence showing it was objectively unreasonable for his trial counsel to employ Fitzgerald's expertise and experience to counter Merillat's. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 689. Trial counsel have broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir.) (the Supreme Court has emphasized counsel has wide latitude in deciding how best to represent a client), *cert. denied*, 136 S. Ct. 86 (2015); *Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir.) (recognizing the broad deference to which counsel is entitled in making tactical decisions in closing argument) (quoting *Yarbrough v. Gentry*, 540

---

[70] SHCR, at p. 1282.

U.S. 1, 5-6 (2003)), *cert. denied*, 133 S. Ct. 179 (2012). This wide latitude includes the discretion to determine how best to utilize the limited investigative resources available to defense counsel. *See Harrington v. Richter,* 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Petitioner made no effort to rebut or controvert attorney Weber's affidavit explaining the objectively reasonable approach Petitioner's trial counsel chose in addressing Merillat's trial testimony.[71] Petitioner's defense counsel (1) retained and consulted with Fitzgerald, who had experience as a rebuttal witness to Merillat, (2) obtained from Fitzgerald an outline of what Merillat could be expected to testify, and (3) determined to counter Merillat through cross-examination and by having Fitzgerald testify in rebuttal. At the punishment phase of Petitioner's trial, Fitzgerald testified in pertinent part (1) a convicted capital murderer sentenced to life without parole would be classified as G-3 but would not be able to work outside the walls of a prison unit, even under direct supervision (contradicting Merillat's assertion), (2) because he had been convicted of capital murder, Petitioner would never be able to improve his classification status above the G-3 level and would be housed with other G-3 inmates, (3) Petitioner's classification status could be decreased for bad behavior, (4) living conditions within the TDCJ are not good – there is no air conditioning, constant supervision, and no freedom, and (5) since 2006 there had been seventeen murders within all the TDCJ's units.[72] On cross-examination,

---

[71] As explained above, Petitioner complained his trial counsel failed to furnish statistical data to the jury which refuted Merillat's trial testimony but Petitioner failed to furnish the state habeas court with any hard statistical information which contradicted any significant aspect of Merillat's trial testimony. In fact, many of the charts and tables included in Petitioner's first state habeas corpus application were bereft of data. SHCR, at pp. 56-62.

[72] Testimony of Larry Fitzgerald, RR Vol. 27, at pp. 154-72, 185-87.

however, Fitzgerald admitted (1) TDCJ prisoners have access to materials they can fashion into weapons, (2) with the permission of a warden, a G-3 inmate could work in a craft shop, (3) G-3 inmates could be escorted outside prison walls but not to work, (4) escapes are rare but have occurred with escapees committing acts of violence, (5) a number of TDCJ staff come into contact with G-3 inmates on a routine basis, (6) a G-3 inmate would have opportunities to be violent inside the prison, and (7) a lot of assaults and fights go on inside the TDCJ units.[73]

Respondent correctly argues Merillat's testimony and similar types of expert testimony regarding the Texas prison classification system and the incidence of violence and drugs within Texas prisons had been admitted into evidence at the punishment phases of Texas capital murder trials long before Petitioner's trial.  *See Coble v. State*, 330 S.W.3d 253, 287-88 (Tex. Crim. App. 2010) (holding Merillat's expert testimony on the Texas prison classification system and violence in prisons was admissible as rebuttal to the defense's expert testimony suggesting the defendant posed a low risk of future dangerousness even though Merillat admitted he knew nothing about the defendant personally), *cert. denied*, 564 U.S. 1020 (2011); *Lucero v. State*, 246 S.W.3d 86, 96-98 (Tex. Crim. App.) (holding admissible the fact testimony of Merillat's colleague Royce Smithee about Texas prison conditions in general and Smithee's opinion testimony that violence can occur within the Texas prison system), *cert. denied*, 555 U.S. 818 (2008); *Threadgill v. State*, 146 S.W.3d 654, 670-71 (Tex. Crim. App. 2004) (Merillat's testimony that violence was prevalent within the Texas prison system (and photographs of homemade weapons found inside Texas prisons) admissible in rebuttal to a defense expert who testified about the Texas prison classification system and controls in place to maintain security and safety within the prison system); *Jenkins v. State*, 912 S.W.2d 793., 818 (Tex. Crim. App.

---

[73] *Id.*, at pp. 172-85, 187-88.

1995) (*on mot. reh'g*) (holding admissible expert testimony on the availability of drugs in the Texas prison system when there was other testimony suggesting the defendant was a drug user and drugs might make him more dangerous than he normally was: "the evidence about the availability of drugs in prison was relevant to show appellant could be just as dangerous in prison society as he is in nonprison society where drugs are freely available).

Given the established Texas precedent, the state habeas court reasonably concluded Petitioner's trial counsel acted in an objectively reasonable manner in not moving to exclude Merillat's testimony regarding the availability of drugs and alcohol inside the Texas prison system but, rather, in preparing to cross-examine Merillat and rebut his testimony with Fitzgerald's. *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir.) ("failure to assert a meritless objection cannot be grounds for a finding of deficient performance."), *cert. denied*, 133 S. Ct. 179 (2012); *Paredes v. Quarterman*, 574 F.3d at 291 (failure to raise a meritless objection does not satisfy the deficient performance prong of *Strickland*); *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (failure to raise futile or meritless objections is not ineffective lawyering), *cert. denied*, 552 U.S. 1314 (2008); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003).

Under such circumstances, the state habeas court reasonably concluded it was objectively reasonable for Petitioner's trial counsel to choose to challenge Merillat's testimony through cross-examination and a live rebuttal witness rather than attempting a likely futile effort to prevent Merillat from expressing his opinions in front of Petitioner's capital sentencing jury. The state habeas court's conclusion that Petitioner's trial counsel reasonably chose to rely upon

Fitzgerald's expertise in addressing Merillat's testimony (rather than obtaining and reviewing copies of Merillat's prior testimony from the TDS and the ACLU) was fully supported by the evidence before the state habeas court and an eminently reasonable application of the deficient performance prong of *Strickland* analysis.

      b.    <u>No Prejudice</u>

Because the state habeas court did not address the prejudice prong of *Strickland* analysis when it rejected Petitioner's second claim for state habeas corpus relief in his first state habeas corpus application, this Court's review of the prejudice prong of Strickland vis-à-vis the same claim is *de novo*. *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20; *Wiggins v. Smith*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27. Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have

been different. *Hinton v. Alabama,* 134 S. Ct. 1081, 1089 (2014); *Ayestas v. Stephens*, 817 F.3d 888, 898 (5th Cir. 2016).

As explained above, the state habeas court ruled Merillat's testimony was relevant and admissible. Petitioner was not "prejudiced by the failure of his trial counsel to object to or seek to exclude "relevant and admissible" evidence. *See Segundo v. Davis*, ___ F.3d ___, ___, 2016 WL 4056397, *3 (5th Cir. July 28, 2016) (failure of trial counsel to raise a meritless claim satisfies neither prong of *Strickland* analysis); *Paredes v. Quarterman*, 574 F.3d at 291 n.13 (failure to raise a meritless argument cannot be the basis for an ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue). Even if some of Merillat's anecdotal references to specific incidents of violence mentioned by Merillat during his punishment phase testimony could have somehow been excluded under state evidentiary rulings, on cross-examination Fitzgerald corroborated the most salient portions of Merillat's testimony, i.e., the fact that G-3 inmates have the opportunity to commit acts of violence on persons with whom they come into contact, the materials to make homemade weapons are available to Texas prison inmates, and there are a lot of assaults and fights inside Texas prisons. Petitioner's mental health expert Dr. Cantu admitted during his cross-examination that Texas prison inmates can get access to drugs and alcohol.[74] Furthermore, for the reasons discussed above in Section VII.E., there was ample evidence from which the jury could have concluded quite rationally that Petitioner's self-serving assertion that he was suffering from the debilitating effects of acute alcohol and methamphetamine intoxication at the time of his offense was incredible.

---

[74] Testimony of Dr. Robert Cantu, RR Vol. 27, at p. 246; SHCR, at p. 2629.

By the time Merillat testified at the punishment phase of Petitioner's capital murder trial, the jury had already convicted Petitioner of capital murder for a double homicide, seen Petitioner's confession to the brutal murder of an elderly Pennsylvania woman, heard testimony from Sharon Wilson and Glenda Purcell about the vicious manner in which Petitioner terrorized them both, heard un-contradicted eyewitness testimony about Petitioner's murder of Michael Allred, heard testimony from forensic pathologists about the autopsies of five of Petitioner's victims, and heard testimony from New York law enforcement officers regarding Petitioner's calm demeanor shortly after his arrest. In short, by the time Merillat took the stand, it was undisputed Petitioner was (1) the confessed murderer of an elderly woman, (2) the convicted murderer of two innocent teenage girls, (3) the murderer of Marble Falls bartender Michael Allred - who had tried to help protect another potential victim of Petitioner's predatory onslaught and was killed by a single fatal shot despite the fact Petitioner was at the same moment fending off an assault by another of Glenda Purcell's protectors, (4) in all reasonable probability, the murderer of Paula Griffith and Jay Feltner – each of whom was felled by a single, fatal, shot, (5) a person with a long history of violence toward women and those weaker than him, (6) an abuser of drugs and alcohol, (7) a "smooth" talker who charmed a number of women into opening their homes to him only to later discover Petitioner had stolen from them, and (8) a highly manipulative antisocial personality.

Under such circumstances, there is not even a remote possibility, much less a reasonable probability, that, but for the failure of Petitioner's trial counsel to exclude Merillat's anecdotal comments about specific instances of violence inside TDCJ prisons, the outcome of the punishment phase of Petitioner's capital murder trial would have been different. This Court

independently concludes Petitioner's second claim herein fails to satisfy the prejudice prong of *Strickland* analysis.

### 4.    Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's ineffective assistance complaint about his trial counsel's failure to move to exclude and more aggressively challenge the trial testimony of Merillat was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding.  The state habeas court reasonably concluded this ineffective assistance claim fails to satisfy the deficient performance prong of *Strickland* analysis.   This Court independently concludes after *de novo* review this claim fails to satisfy the prejudice prong of *Strickland* analysis.  Petitioner's second claim herein does not warrant federal habeas corpus relief.

### D.    Failure to Exclude Dr. Coons' Future Dangerousness Testimony

### 1.    The Claim Restated

In his fourth claim for relief, Petitioner argues his trial counsel rendered ineffective assistance by failing to (1) seek the exclusion of Dr. Coons' testimony on future dangerousness as unreliable under Texas evidentiary rules, (2) request a *Daubert* hearing on the admissibility of Dr. Coons' testimony on future dangerousness, (3) object on both state evidentiary and federal constitutional grounds to Dr. Coon's testimony on future dangerousness, and (4) contact the

Texas Defender Service to get copies of Dr. Coons' testimony from prior capital murder trials for use in cross-examination.[75]

## 2.    State Court Disposition

Petitioner presented an expanded version of this same claim as his fourth claim for relief in his first state habeas corpus application.[76]  Petitioner's trial counsel Tom Weber, who cross-examined Dr. Coons at trial, furnished the state habeas court with an affidavit in which he explained that (1) once he established that Dr. Coons had recently interviewed Petitioner, he concluded based upon his experience the state trial court would qualify Dr. Coons as an expert and permit Dr. Coons to express an opinion regarding Petitioner's future dangerousness, (2) he did not want to question Dr. Coons during a pretrial hearing on admissibility because he believed such a hearing would end adversely to the defense and he wanted to avoid tipping off Dr. Coons as to the areas he planned to pursue on cross-examination at trial, (3) he did not want to permit Dr. Coons an opportunity to prepare for his cross-examination, (4) he believed there was nothing to be gained from the defense challenging the admissibility of Dr. Coons' opinion testimony and potentially significant downside to such an approach, (5) he instead chose to focus his preparations on cross-examining Dr. Coons, (6) during Dr. Coons' cross-examination, he elicited admissions that Dr. Coons had visited with Petitioner on only one occasion and had not reviewed any of the voluminous state prison and jail records the defense presented at trial through defense investigator J.W. Thompson, and (7) he believed it was more beneficial to the defense to establish a lack of foundation for Dr. Coons' opinion on future dangerousness than to

---

[75] Amended Petition, at pp. 83-95.

[76] SHCR, at pp. 89-118.

unsuccessfully challenge Dr. Coons' testimony as unreliable in a pretrial hearing and possibly lose the element of surprise.[77]   The state habeas trial court found (1) defense counsel made an informed strategic decision not to challenge the admissibility of Dr. Coons' testimony on future dangerousness and not to request a *Daubert* hearing, (2) defense counsel did not wish to alert Dr. Coons to the nature of his questioning outside the presence of the jury because doing so might give Dr. Coons time to improve his responses to questions before the jury, (3) on cross-examination, Petitioner's trial counsel established Dr. Coons (a) had not reviewed Petitioner's state prison and jail records from New York, (b) had interviewed Petitioner only once, (c) was aware of no episodes of explosive disorders or violent behavior by Petitioner while incarcerated, and (d) knew of no instances in which Petitioner had ever refused to take prescribed medication while incarcerated, (4) Dr. Coons' testimony on future dangerousness was relevant, scientifically reliable, and admissible, (5) other testimony reliably replicated Dr. Coons' testimony that Petitioner posed a future danger under certain circumstances, and (6) prosecution expert Merillat established the conditions under which Petitioner could pose a future danger are present in Texas prisons.[78]   The state habeas trial court concluded (1) Petitioner's trial counsel's decision not to challenge the admissibility of Dr. Coons' testimony was reasonable and part of a well-developed and sound trial strategy, (2) Petitioner failed to show the decision by his trial counsel to rebut Dr. Coons' opinion through cross-examination was unreasonable, (3) Dr. Coons' testimony on future dangerousness was relevant and admissible, (4) Petitioner's trial counsel was not ineffective for failing to object to admissible testimony, (5) the performance of Petitioner's trial counsel did not

---

[77] SHCR, at pp. 1217-19.

[78] SHCR, at pp. 1285-87.

fall below an objective level of reasonableness, (6) Dr. Cantu's testimony corroborating Dr. Coons' testimony on future dangerousness foreclosed reversal of Petitioner's conviction, and (7) Petitioner failed to show the outcome of his trial would have been different had Dr. Coons' future dangerousness testimony been excluded.  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions when it denied Petitioner's first state habeas corpus application.

> 3.  AEDPA Review

> > a.  No Deficient Performance

Insofar as Petitioner argues his trial counsel should have urged a *Daubert* challenge to the admissibility of Dr. Coons' future dangerousness opinion testimony, for the reasons set forth above in detail in Sections IV.C. and IV.D. that argument has no arguable merit.  *See Williams v. Stephens*, 761 F.3d at 571 (the Fifth Circuit has held many times *Daubert* does not govern the admissibility of expert opinions at the sentencing phase of a capital murder trial).  Dr. Coons' testimony on future dangerousness was admissible under well-settled federal constitutional principles.  Petitioner's trial counsel cannot reasonably be faulted for failing to raise a futile *Daubert* objection to the admission of Dr. Coons' testimony on future dangerousness.  *See Miller v. Thaler*, 714 F.3d at 904 n.6 (counsel is not required to make futile motions or objections); *Roberts v. Thaler*, 681 F.3d at 612 ("the failure to lodge futile objections does not qualify as ineffective assistance" (quoting *Koch v. Puckett*, 907 F.2d at 527)); *Ward v. Dretke*, 420 F.3d at 498 (counsel not ineffective for failing to lodge what would likely have been a futile objection).

Insofar as Petitioner complains his trial counsel should have urged an objection premised upon a lack of scientific reliability under the Texas Rules of Evidence, such an objection would,

in all reasonable likelihood, have been equally futile.  The state habeas trial court ruled Dr. Coons' testimony on future dangerousness was relevant, reliable, and admissible.[79]  The Texas Court of Criminal Appeals adopted that finding and conclusion when it denied Petitioner's first state habeas application.  Thus, that conclusion binds this Court on federal habeas review. *Bradshaw v. Richey*, 546 U.S. at 76; *Garza v. Stephens*, 738 F.3d at 677.  Texas courts have repeatedly found psychiatric predictions of future dangerousness to be admissible.  *Johnson v. Cockrell*, 306 F.3d at 255.  Petitioner's trial counsel cannot reasonable be faulted for failing to raise such a futile objection.  *See Clark v. Thaler*, 673 F.3d at 429 ("failure to assert a meritless objection cannot be grounds for a finding of deficient performance."); *Paredes v. Quarterman*, 574 F.3d at 291 (failure to raise a meritless objection does not satisfy the deficient performance prong of *Strickland*); *Wood v. Quarterman*, 503 F.3d at 413 (failure to raise futile or meritless objections is not ineffective lawyering).

Moreover, Petitioner made no effort during his state habeas corpus proceeding to present any evidence rebutting or refuting the objectively reasonable explanation his trial counsel gave for his decision not to challenge Dr. Coons before trial for fear of tipping off Dr. Coons to possible weaknesses in the basis for Dr. Coons' opinion on future dangerousness.  This Court notes Dr. Coons testified without contradiction at trial that he is a law school graduate as well as a licensed psychiatrist.[80]  Insofar as Petitioner faults his trial counsel for failing to anticipate the evidentiary ruling in *Coble v. State, supra*, Respondent correctly points out *Coble* was decided a

---

[79] SHCR, at pp. 1287-88.

[80] Testimony of Richard Coons, RR Vol. 28, at p. 6; SHCR, at p. 2639.

year *after* Petitioner's trial and dealt with a completely distinguishable fact situation.[81]  Insofar as Petitioner urges the adoption of a new rule applying the *Daubert* gatekeeping standard to opinions regarding future dangerousness offered at the punishment phase of capital murder trials, this Court is precluded from adopting such a new rule in the context of this federal habeas corpus proceeding by the non-retroactivity doctrine of *Teague*.  *Johnson v. Cockrell*, 306 F.3d at 255; *Tigner v. Cockrell*, 264 F.3d 521, 526-27 (5th Cir. 2001), *cert. denied*, 534 U.S. 1164 (2002).

b.      No Prejudice

The state habeas court accurately noted that Dr. Coons' opinion regarding Petitioner's future dangerousness was consistent with the testimony of Petitioner's own experts.   As explained above, Dr. Cantu expressed the opinion that, given access to drugs or alcohol and a vulnerable victim, Petitioner could pose a danger within the prison system.[82]  Larry Fitzgerald acknowledged that TDCJ inmates have access to materials from which they can fashion weapons, G-3 inmates have the opportunity to commit acts of violence, and assaults and fights are common inside the TDCJ units.[83]  A.P. Merillat testified without contradiction drugs and alcohol are accessible to TDCJ inmates.[84]  Petitioner's trial counsel obtained significant concessions from Dr. Coons on cross-examination regarding Dr. Coons' lack of familiarity with

---

[81] In *Coble*, Dr. Coons was asked to express an opinion regarding a defendant whom he had interviewed twenty years before whom he did not independently remember and, in the intervening years, Dr. Coons had lost all of his interview notes from the interview in question.  Under those circumstances, the Texas Court of Criminal Appeals determined Dr. Coons' testimony was insufficiently reliable but concluded admission of the testimony was not harmful.  *Coble v. State*, 330 S.W.3d at 277-80, 287.  In contrast, Dr. Coons interviewed Petitioner just days before the start of the guilt-innocence phase of trial and wrote a report stating his conclusions.  Testimony of Richard Coons, RR Vol. 28, at pp. 9-10.

[82] Testimony of Dr. Robert Cantu, RR Vol. 27, at pp. 246-47; SHCR, at p. 2629.

[83] Testimony of Larry Fitzgerald, RR Vol. 27, at pp. 182-83, 185, 187.

[84] Testimony of A.P. Merillat, RR Vol. 27, at pp. 23-25.

Petitioner's record of good behavior during prior incarcerations and detentions. Petitioner did not furnish the state habeas court with any evidence showing his trial counsel could have elicited further favorable information from Dr. Coons on cross-examination had Petitioner's counsel reviewed all of the transcripts of prior testimony Dr. Coons had given in other capital murder trials. The state habeas court reasonably concluded the failure of Petitioner's trial counsel to move to exclude Dr. Coons' future dangerousness testimony did not prejudice Petitioner within the meaning of *Strickland*. Furthermore, for the reasons discussed above in Sections VII.E. and IX.C.3.b., this Court independently concludes the failure of Petitioner's trial to move to exclude Dr. Coons' testimony on future dangerousness does not satisfy the prejudice prong of *Strickland* analysis.

4. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of this ineffective assistance claim was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding. The state habeas court reasonably concluded this allegation of ineffective assistance fails to satisfy either prong of *Strickland* analysis. Petitioner's fourth claim herein does not warrant federal habeas corpus relief.

E.    Failure to Exclude Dr. Coons' "Life Without Parole" Testimony

    1.    The Claim Restated

In his sixth claim for relief, Petitioner argues his trial counsel rendered ineffective assistance by failing to (1) object to, impeach with studies from scholarly journals, or otherwise challenge the reliability and admissibility of Dr. Coons' opinion that inmates serving terms of life imprisonment without the possibility of parole had little motivation to behave and obey prison rules, (2) failing to voir dire Dr. Coons on his professional experience with such inmates, (3) failing to cross-examine Dr. Coons regarding his professional experience with such inmates, and (4) failing to establish Dr. Coons testified falsely that he had such experience.[85]

    2.    State Court Disposition

Petitioner presented the same basic complaints to the state habeas court as his sixth claim for relief in his first state habeas corpus application.[86]  The state habeas trial court (1) found Dr. Coons' opinion about the lack of motivation of capital inmates sentence to life without parole to behave well in prison was based on his experience in working with such inmates, (2) concluded Dr. Coons' testimony on this subject was relevant and admissible, (3) concluded defense counsel's performance did not fall below an objective standard of reasonableness, and (4) concluded Petitioner failed to show the outcome of his trial would have been different had the

---

[85] Amended Petition, at pp. 95-111.

[86] SHCR, at pp. 119-33.

evidence been excluded.[87]   The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions when it denied Petitioner's first state habeas corpus application.

     3.     AEDPA Analysis

          a.     No Deficient Performance

The state habeas court's conclusion that Dr. Coons' opinion about the low motivations of "life without parole" inmates to obey prison rules and otherwise behave well was reliable and admissible binds this Court on federal habeas review. *Bradshaw v. Richey*, 546 U.S. at 76; *Garza v. Stephens*, 738 F.3d at 677. Petitioner's trial counsel cannot reasonably be faulted for failing to object to or seek to exclude admissible evidence. *Miller v. Thaler*, 714 F.3d at 904 n.6; *Roberts v. Thaler*, 681 F.3d at 612.

Insofar as Petitioner complains about the state habeas court's implicit credibility determination that Dr. Coons' testimony that he had experience with "life without parole" inmates was reliable and accurate, Petitioner has not presented this Court with clear and convincing evidence showing the state habeas court's implicit credibility finding was erroneous. The state habeas trial court was confronted with sworn testimony given under oath by Dr. Coons, who was subject to cross-examination. The only contrary assertions before the state habeas court consisted of unsworn declarations contained in Petitioner's unsworn, unverified, first state habeas corpus application.[88]   Unsworn and unverified materials are no substitute for admissible evidence. *See Davis v. Hernandez*, 798 F.3d 290, 291 (5th Cir. 2015) (holding unsworn testimony is competent as summary judgment evidence only when executed pursuant to 28

---

[87] SHCR, at pp. 1291-93.

[88] SHCR, at pp. 121, 124-27, 129-32.

U.S.C. § 1746); *Provident Life & Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 & n.77 (5th Cir. 2001) (unsworn expert reports do not qualify as affidavits or otherwise admissible evidence for the purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment); *Okoye v. Univ. Tex. Houston Health Sci. Center*, 245 F.3d 507, 515 (5th Cir. 2001) (unsworn statement incompetent as summary judgment evidence).   Petitioner presented the state habeas court with no admissible evidence (and presents this Court with no admissible evidence) from anyone claiming to possess personal knowledge of Dr. Coons' experience (or lack thereof) working with inmates serving "life without parole."

Under such circumstances, Petitioner has failed to overcome the presumption of correctness to which the state habeas court's implicit credibility finding is entitled. *See Norris v. Davis*, ___ F.3d at ___, 2016 WL 3418412, at *3 (5th Cir. June 21, 2016) ("when considering a motion for summary judgment in the context of habeas corpus cases, the state court's factual findings are presumed correct unless the petitioner can show by clear and convincing evidence that the presumption should not apply."); *Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) ("Under 28 U.S.C. § 2254(e)(1), 'a determination of a factual issue made by a State court shall be presumed to be correct' and the habeas petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)), *cert. denied,* 136 S. Ct. 38 (2015); *Jordan v. Epps*, 756 F.3d 395, 405 (5th Cir. 2014) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless

objectively unreasonable in light of the evidence presented in the state-court proceeding."), *cert. denied sub nom. Jordan v. Fisher*, 135 S. Ct. 2647 (2015).

      b.     <u>No Prejudice</u>

The state habeas court also determined Petitioner's complaints about his trial counsel's failure to object to and seek to impeach this aspect of Dr. Coons' testimony failed to satisfy the prejudice prong of *Strickland* analysis. After conducting a *de novo* review of the entire record from Petitioner's trial, direct appeal, and state habeas corpus proceedings, this Court independently concludes there is no reasonable probability that, but for the failure of Petitioner's trial counsel to exclude or impeach this aspect of Dr. Coons' testimony, the jury's answers to any of the Texas capital sentencing scheme's special issues would have been any different. As explained above in Section IX.C.3.b., the evidence of Petitioner's propensity for future acts of criminal violence was overwhelming. By the time Dr. Coons' offered his brief impressions regarding the motivations of inmates serving "life without parole," the same jury which eventually answered the Petitioner's capital sentencing special issues had (1) convicted Petitioner beyond a reasonable doubt of the double homicide of a pair of teenage girls, for one of whom Petitioner allegedly held some degree of affection, (2) heard un-contradicted, harrowing, accounts from Sharon Wilson, Glenda Purcell, and others detailing Petitioner's rampages against them and the fatal shooting of Michael Allred, (3) heard un-contradicted testimony from law enforcement officers concerning the gruesome crime scene at Pamela Griffith's home and Petitioner's calm demeanor when arrested in New York, (4) heard testimony from medical experts regarding the autopsies of five of Petitioner's shooting victims, (5) read Petitioner's handwritten confession to the murder of Betty DeHart in Pennsylvania, and (6) heard Dr. Cantu

admit that, given access to alcohol or drugs, access to vulnerable persons, and a lack of supervision, Petitioner could pose a risk of dangerousness inside Texas prisons.   On cross-examination, defense expert Larry Fitzgerald admitted there was the potential for TDCJ inmates in general population to engage in acts of violence within the prison system and following escape, corroborating the testimony of prosecution expert A.P. Merillat.

This is not a case in which defense counsel failed to present a strong case in mitigation. Petitioner's mental health expert Dr. Ollie Seay testified at the punishment phase of trial that Petitioner (1) "functions [intellectually] approximately as a little bit below what most people do overall,"[89] (2) performed very, very low on a variety of vocabulary, verbal comprehension, and problem-solving tests,[90] (3) "showed great skill, actually a little high average skill in the ability to see/whole relationships or to see how things fit together,[91] (4) "scored kind of in the low average to borderline range in other areas of alertness to details,"[92] (5) "scored very, very low average in a test that looks at being able to see the sequence of events,"[93] (6) had a full scale of 80 on an IQ test, which was sufficiently above the range for mental retardation that further evaluation for mental retardation was not undertaken,[94] (7) has trouble understanding and comprehending more complex ideas, would have difficulty understanding contracts, but does well at performing work, things needed for vocations skills, putting things together, and

---

[89] Testimony of Dr. Ollie Seay, RR Vol. 27, at p. 201.

[90] *Id.*. at p. 202.

[91] *Id.*, at p. 203.

[92] *Id.*

[93] *Id.*

[94] *Id.*, at pp. 201-04.

understanding what you need to do in order to get a job done,[95] (8) showed the same pattern of very, very low verbal skill but very high nonverbal skills in testing done when he was fifteen, suggesting Petitioner's problems are longstanding,[96] (9) was not in school a lot and earned mostly poor grades,[97] (10) reported using a wide variety of street drugs, including cocaine, crack, special K, PCP, and crystal methamphetamine,[98] (11) reported he began abusing alcohol and a number of drugs in his adolescence and used many substances daily,[99] (12) had been diagnosed with "psychotic disorder not other specified" and received prescription medications for that condition,[100] and (13) did not fit the criteria for mental retardation.[101]  On cross-examination, Dr. Seay testified Petitioner (1) reported he had anger management problems in school and (2) was diagnosed in psychiatric record with "psychotic disorder not otherwise specified" and "polysubstance abuse" on Axis I of the DSM-IV and with personality disorder not otherwise specified, antisocial avoidant and passive aggressive traits on Axis II.[102]

Another of Petitioner's mental health experts, clinical psychiatrist Dr. Robert Cantu, testified on direct examination in pertinent part that Petitioner (1) had a "recurring theme"

---

[95] *Id.*, at p. 206.

[96] *Id.*, at p. 207.  Dr. Seay also testified she had reviewed reports indicating Petitioner's mother had alcoholism and may also have had mental limitations.  *Id.*, at p. 208.

[97] *Id.*, at p. 208.

[98] *Id.*, at pp. 209-10.

[99] *Id.*, at p. 210.

[100] *Id.*

[101] *Id.*, at pp. 212-13.

[102] *Id.*, at pp. 216-17, 221-24.

throughout his history of alcohol and drug abuse,[103] (2) was first intoxicated by alcohol at age eight, began drinking alcohol at age fourteen, and within a year was drinking on a daily basis,[104] (3) continued drinking throughout his life and began ingesting marijuana in his late teens, cocaine in his early to mid-twenties, and began abusing methamphetamine in his late-twenties to early-thirties,[105] (4) consumed a liter or rum and an ounce of methamphetamine within six to twelve hours of the start of his murder spree,[106] (5) would have experienced an impaired mental state, particularly with regard to decision making and judgment, as a result,[107] (6) was up all night the evening and early morning before he purchased the methamphetamine at the hospital complaining of a bleeding rectum which medical examination failed to confirm,[108] (7) had been incarcerated numerous times over the years but with no record of documented disciplinary actions relating to violence or aggression during those incarcerations,[109] (8) had no record of violence, aggression, or oppositional defiant behavior during his pretrial detention at the Travis County Jail,[110] (9) has a significant number of arrests for DWI,[111] (10) had been diagnosed with "psychotic disorder not otherwise specified," which means an impairment of reality testing

---

[103] Testimony of Dr. Robert Cantu, RR Vol. 27, at p. 235.

[104] *Id.*, at p. 236.

[105] *Id.*, at pp. 236-37.

[106] *Id.*, at pp. 237-38.

[107] *Id.*, at p. 238.

[108] *Id.*, at p. 239.

[109] *Id.*, at p. 240.

[110] *Id.*, at p. 241.

[111] *Id.*, at p. 242.

characterized by very disorganized thinking, difficulty remaining coherent in a goal-oriented manner, and nonsensical verbal comments,[112] (11) was treated for that condition prior to trial with medications which resolved his hallucinations and delusions and brought him back to an ability to focus and answer questions and stay in touch with reality,[113] (12) would likely be unable to cope in prison without such medications,[114] (13) has a history which suggests he will do very well in prison with regard to compliance and a lack of disciplinary issues, where he would have less access to alcohol and drugs and more structure than in the free world[115] and (14) would not be a danger to others inside prison walls.[116] On cross-examination, Dr. Cantu testified (1) some people do obtain access to alcohol and drugs inside prison,[117] (2) people inside prison have the opportunity to commit assaults,[118] (3) if given freedom and a lack of supervision, Petitioner might be a threat to others in prison,[119] (4) has a history of being able to persuade women to take him in but his relationships with those same women have been permeated with violence,[120] (5) claimed to have consumed a liter of rum and an ounce of methamphetamine before committing his murders, which Petitioner claimed rendered him "out of his mind" during

---

[112] *Id.*, at pp. 242-43.

[113] *Id.*, at pp. 242-43.

[114] *Id.*, at p. 243.

[115] *Id.*, at p. 244.

[116] *Id.*, at p. 245.

[117] *Id.*, at p. 246.

[118] *Id.*

[119] *Id.*, at pp. 246-47.

[120] *Id.*, at pp. 248-49.

94

his crimes,[121] (6) was nonetheless able to describe to Dr. Cantu in great detail his murders of four

people at the home of Paula Griffith,[122] and (7) would be a future danger if given access to large

amounts of alcohol and drugs, the opportunity to harm someone weaker than him, and a lack of

structured environment.[123] On redirect, Dr. Cantu opined (1) Petitioner would likely be denied

the things in prison which caused him to act out violently and (2) he believed the primary

evidence supporting his opinion that Petitioner will not be dangerous in prison is the lengthy

record of Petitioner's prior incarcerations which show no reported incidents of violence.[124]

Petitioner also called Dr. Leslie Rosenstein, a clinical neuropsychologist, who conducted

a neuropsychological evaluation of Petitioner and testified in pertinent part (1) Petitioner has a

history of alcoholism and abuse of crack cocaine and other drugs,[125] (2) Petitioner suffers from

deficits and weaknesses in brain functioning (impaired brain functioning) characterized by

impairments in problem-solving and cognitive flexibility, impaired language skills, below

normal verbal memory, significantly below average verbal learning, an inability to live

independently, deficits in abstract planning and novel problem solving, difficulty understanding

the consequences of behavior, and deficits in fine motor skills,[126] (3) all of which established a

---

[121] *Id.*, at pp. 252-53.

[122] *Id.*, at pp. 254-56. Dr. Cantu testified Petitioner gave "pretty detailed histories" of his murders at the Griffith home, describing shooting Jay Feltner in the head, shooting Paula Griffith in the back of the head after she began running following the fatal shooting of Jay Feltner, then shooting Haylie, and finally shooting Danielle multiple times as she lay screaming on the couch. *Id.*, at pp. 255-56.

[123] *Id.*, at p. 258.

[124] *Id.*, at pp. 259-60.

[125] Testimony of Dr. Leslie Rosenstein, RR Vol. 28, at pp. 102-04.

[126] *Id.*, at pp. 106-08.

brain abnormality suggestive of brain damage,[127] (4) even though he does not meet the legal definition of mental retardation, Petitioner functions in many ways like a person with mental retardation in that his intellectual and cognitive abilities are similar to a person with mental retardation and he displays deficits in areas of adaptive functioning, specifically an inability to live independently and a history of poor academic performance,[128] (5) the most likely cause of Petitioner's abnormal brain functioning was exposure to alcohol in utero (also known as Fetal Alcohol Syndrome and Fetal Alcohol Effects), which was confirmed by Petitioner's (a) neuropsychological evaluation (showing impulsivity, low verbal skills, and antisocial behavior), (b) distinctive physical features (smooth philtrum between nose and upper lip, narrow wide-set eyes, and small statute), (c) lateralized brain dysfunction (more impairments in verbal skills than nonverbal skills), and (d) diagnosis of psychotic disorder, social immaturity, impulsivity, and poor academic functioning.[129]   On cross-examination, Dr. Rosenstein testified (1) Petitioner has a family history of alcohol dependence and a mother with alcohol issues,[130] (2) while Petitioner has an IQ of 80 and does not meet the legal definition of mental retardation, only about half of people with Fetal Alcohol Syndrome/Fetal Alcohol Effects are mentally retarded,[131] (3) Petitioner's symptoms are consistent with someone exposed to alcohol in utero,[132] (4) he was

---

[127] *Id.*, at p. 109.

[128] *Id.*, at pp. 109-12, 150.  Dr. Rosenstein also testified (1) Petitioner would not likely be able to work in a situation where he did not have supervision and where he might encounter new issues or new problems and (2) a structured environment, like a jail, would be a better place for Petitioner.  *Id.*, at pp. 112-13.

[129] *Id.*, at pp. 114-18.

[130] *Id.*, at pp. 122-23.

[131] *Id.*, at p. 122-24.

[132] *Id.*, at pp. 123, 148-49.  Dr. Rosenstein also testified he had received information that Petitioner's mother was an alcoholic.  *Id.*, at p. 147.

aware of no evidence showing Petitioner had been beaten or sexually abused while a child,[133] (5) Petitioner has been diagnosed with intermittent explosive disorder, which means a person has displayed repeated episodes of aggressive violent behavior grossly out of proportion to a situation,[134] (6) "my findings in his history are consistent with somebody who has fetal alcohol syndrome or fetal alcohol effects; and people with alcohol effects or syndrome are at increased problems with the law and impulsive behavior,"[135] and (7) Petitioner performs in the abnormal range in terms of problem solving, his verbal intellectual skills, and his memory scores, and shows signs of impulsivity.[136]   On redirect, Dr. Rosenstein testified Petitioner tested below average on a wide range of tests he administered and displayed responses consistent with someone having moderate depression.[137]

In addition, Petitioner's trial counsel presented testimony from Petitioner's aunt and sister designed to humanize Petitioner by highlighting his good character traits and explaining Petitioner (1) endured difficulties as a child raised in a family where his birth father left when Petitioner was quite young and his step-father abused Petitioner by making him stay in his room or kneel in a corner, (2) has skills as a handyman, (3) was a giving, caring brother growing up, (4) began drinking at fifteen or so and drank regularly throughout his teen years and thereafter,

---

[133] *Id.*, at pp. 128-29, 137.

[134] *Id.*, at pp. 130-31.

[135] *Id.*, at p. 134.

[136] *Id.*, at pp. 135-36.

[137] *Id.*, at pp. 138-47.

(5) grew up in a family of drinkers, (6) has always lived with someone else, (7) helped his sister when his brother-in-law was injured, and (8) helped his sister when she had a baby.[138]

Petitioner's trial counsel also presented the video-taped depositions of Petitioner's mother and brother, who were unable to attend the trial due to health issues.[139] Petitioner's mother testified in her videotaped deposition that Petitioner (1) had problems with drinking and taking pills since he was seventeen, (2) is violent when he drinks, (3) stole money from his sister in 2005, (4) lies a lot, (5) called her during his crime spree to tell her he had shot several people and did not know if they were alive or dead, (6) responded to her pleas that he turn himself in by saying "I gotta do what I gotta do," (7) once wrapped a telephone cord around her neck which caused her to get a protective order against him, (8) was incoherent during another telephone conversation after the murders, (9) was two when his birth father, who drank a lot and once put the boys in a closet, left the family, (10) was young when she asked his step-father to leave, (11) was never struck by his step-father, who preferred to discipline the boys by making them sit in a chair or on a couch, (12) liked to sew, cook, bake, and crochet when he was growing up, (13) liked to wear his suit to school, (14) was always a good dresser, (15) worked in a bakery and then became a house painter and was a good painter, (16) started drinking after his seventeen year old girlfriend had an abortion, and (17) in the weeks before the murders told her he had a

---

[138] Testimony of Laura Nelson, RR Vol. 28, at pp. 57-80; Testimony of Elizabeth Petrie, RR Vol. 28, at pp. 81-100.

[139] Transcripts of the videotaped deposition testimony of Diana O'Connell (Petitioner's mother) and Steven Anthony Devoe (Petitioner's brother) appear in RR Vol. 35 near the end of that exhibit volume marked as Defendant's Exhibits 23 and 24.

dream about his late grandmother who told him he was going to die.[140]   Petitioner's brother, Steven Anthony Devoe, testified in his videotaped deposition that Petitioner (1) helped him work on his car, (2) was very willing to help when asked, (3) visited him when he was in the hospital, (4) their mother taught them right from wrong, (5) was not beaten or sexually abused as a child, and (6) is very kind-hearted and willing to lend money.[141]

In conclusion, Petitioner's trial counsel presented a wealth of potentially mitigating evidence during the punishment phase of Petitioner's capital murder trial, including evidence showing Petitioner suffers from fetal alcohol syndrome/fetal alcohol effects, diminished brain function, psychosis, low intellectual functioning, and a long history of alcohol and drug abuse. Petitioner's trial counsel also presented mitigating evidence showing Petitioner's record of good conduct in prison and acts of kindness performed by Petitioner.   For the reasons discussed above in Section VII.E., Petitioner's jury could reasonably have discounted Petitioner's self-serving assertion that he was suffering from acute methamphetamine and alcohol intoxication and was "out of his mind" at the time of his capital offense.   As explained above in Section IX.C.3.b., even without Dr. Coons' speculative assertions about the motivations of "life without parole" inmates, the evidence supporting the jury's affirmative answer to the future dangerousness special issue was overwhelming, the most salient being the fact the Petitioner murdered a total of six people at three different locations while traveling halfway across the country to his home. Despite the fact the defense presented substantial potentially mitigating evidence, Petitioner's

---

[140] The video tape recording of Petitioner's mother's deposition was played in open court for Petitioner's jury at the punishment phase of trial.   The transcript of the video recording of the deposition of Diana O'Connell (Petitioner's mother) appears as Exhibit 26 to Petitioner's first state habeas corpus application, SHCR, at pp. 605-68.

[141] Videotaped Deposition of Steven Anthony Devoe, RR Vol. 35.

jury returned a punishment phase verdict favorable in all respects to the prosecution.  Under such circumstances, this Court independently concludes there is no reasonable probability that, but for the failure of Petitioner's trial counsel to object to, exclude, or impeach Dr. Coons' speculative testimony regarding the motivations of "life without parole" inmates, the outcome of the punishment phase of Petitioner's capital murder trial would have been different.  There is no reasonable probability that, even if erroneously admitted, exclusion or impeachment of Dr. Coons' testimony about "life without parole" inmates would have made any difference at the punishment phase of Petitioner's capital murder trial.

4. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits during Petitioner's first state habeas corpus proceeding of Petitioner's ineffective assistance complaint about the failure of his trial counsel to exclude or impeach Dr. Coons' testimony about "life without parole" inmates was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding.  The state habeas court reasonably concluded this allegation of ineffective assistance fails to satisfy either prong of *Strickland* analysis.  Petitioner's sixth claim herein does not warrant federal habeas corpus relief.

F. Failure to Present All Available Mitigating Evidence

1. The Claim Restated

In his seventh claim herein, Petitioner argues his trial counsel rendered ineffective assistance by failing to (1) more thoroughly investigate Petitioner's background (by among other

things failing to more thoroughly interview Petitioner's family members one-on-one and failing to keep a mitigation expert as part of the defense team throughout trial) and (2) present all available mitigating evidence including (a) evidence showing Petitioner's mother was born in a sanitarium, is mentally retarded and promiscuous, and drank heavily while pregnant with Petitioner, (b) evidence showing Petitioner's childhood was characterized by severe economic deprivation and parental neglect, (c) evidence showing mental retardation and Bi-Polar Disorder are in Petitioner's family history, (d) evidence showing Petitioner's biological father was an alcoholic, unfaithful to Petitioner's mother, suffered from mental impairment which rendered him disabled, an angry drunk who physically abused Petitioner's mother, and a convicted child molester, (e) evidence showing Petitioner's paternal and maternal relatives are all alcoholics, (f) evidence showing Petitioner's record of good behavior in prison and jail, (g) evidence Petitioner is a good house painter and possesses many good character traits, (h) evidence showing Petitioner was too intellectually deficient to live on his own, (i) expert testimony explaining that persons with low intellectual functioning just above the level of mental retardation function intellectually and suffer the same types of adaptive behavior deficiencies as the mentally retarded, (j) expert testimony showing the inaccuracy of professional mental health experts' predictions of future dangerousness, (k) evidence showing Petitioner's maternal uncles taught him as a teenager how to drink, fight, steal, and lie, (l) evidence showing that, by age fourteen, Petitioner was uncontrollable and drinking heaving, (m) evidence showing Petitioner was sexually active by age sixteen, (n) evidence showing Petitioner suffered multiple head injuries, some involving loss of consciousness, as a result of falls he sustained while intoxicated, (o) evidence showing Petitioner fathered a total of four children with two different women but never

furnished any financial support to his children, (p) evidence showing Petitioner attempted suicide at age sixteen after his girlfriend had an abortion, (q) expert testimony showing most criminals grow less violent as they age, (r) evidence showing Petitioner was sexually abused by an unidentified priest, (s) evidence showing Petitioner was diagnosed at age twenty-two with "substance abuse disorder," (t) evidence showing Petitioner suffers from frontal lobe impairment, (u) evidence showing Petitioner suffers from a genetic predisposition toward addiction, (v) evidence showing Petitioner suffers from undiagnosed ADHD and anger control issues, (w) evidence showing Petitioner's "mental decomposition" in the weeks leading up to his murder spree, (x) evidence showing Petitioner suffered emotional abuse and neglect as a child, (y) evidence showing Petitioner definitely suffers from Fetal Alcohol Syndrome/Fetal Alcohol Effects, and (z) further expert testimony emphasizing the mitigating aspects of the mental health testimony Petitioner did present at trial.[142]

## 2.    State Court Disposition

Petitioner presented a similarly encyclopedic series of complaints as his seventh claim for relief in his first state habeas corpus application.[143]  Petitioner's trial counsel each presented the state habeas trial court with affidavits discussing in detail their trial preparation.  In pertinent part, attorney Tom Weber's affidavit explained that (1) from September, 2007 until July, 2009, mitigation specialist Gerald Byington did extensive and excellent work researching Petitioner's background (as demonstrated by a lengthy chronology of Petitioner's life which Byington constructed) interviewing Petitioner's family members by telephone and when the family

---

[142] Amended Petition, at pp. 112-290.

[143] SHCR, at pp. 134-284.

members visited Austin for a pretrial hearing, (2) he was forced to discharge Byington when, just months before trial in July, 2009, Byington (a) refused (despite being guaranteed compensation by Petitioner's trial counsel) to travel to New York to interview Petitioner's family members in person, (b) refused to do any more work on the case, and (c) insisted the defense team should deliberately render ineffective assistance at trial, (3) because the evidence of guilt was so strong, from a very early stage, the defense team focused its efforts on discovering and developing potentially mitigating evidence, (4) toward that end, Byington gathered a great deal of documents and information about Petitioner from Petitioner's family and other sources, (5) defense investigator J.W. Thompson gathered documents showing Petitioner's good behavior during many previous prison incarcerations and jail detentions, (6) the defense team retained the services of several mental health professionals to assist the defense and called Dr. Cantu, Dr. Seay, and Dr. Rosenstein to testify about a wide range of matters of a potentially mitigating nature, (7) as a result of its investigation into Petitioner's background, the defense team realized that Petitioner was not mentally retarded, had not suffered physical or sexual abuse as a child, and his criminal acts throughout his life were always the result of Petitioner getting drunk, doing drugs, and abusing women, (8) after Byington's dismissal, Weber attempted unsuccessfully to recruit another mitigation specialist to work on Petitioner's trial, and (9) co-counsel John Erickson and investigator Thompson flew to New York to interview Petitioner's family members in person.[144]

Attorney John Erickson furnished an affidavit which stated in pertinent part that (1) Dr. Cantu evaluated Petitioner for competency and furnished the defense with helpful testimony

---

[144] SHCR, at pp. 1219-22.

regarding future dangerousness, (2) Dr. Seay evaluated Petitioner's brain function, was unable to conclude Petitioner was mentally retarded, in part, due to a lack of documentation concerning Petitioner prior to age eighteen, but nonetheless furnished helpful testimony, (3) Dr. Rosenstein evaluated Petitioner's brain function, determined deficiencies in several areas, and testified about the possibility Fetal Alcohol Syndrome would explain Petitioner's behavior and deficits in mental function, (4) the defense team retained the services of two other mental health professionals but decided their testimony would not prove beneficial to the defense, (5) the defense team relied upon the work done by the mitigation specialist up to the date of his departure from the team (6) his record formed the majority of the defense's trial exhibits, (7) Byington interviewed Petitioner's family by phone and those who traveled to Austin in person, (8) investigator Thompson traveled to New York, obtained prison and jail records from New York, met with some members of Petitioner's family, and took notes, (9) Petitioner's aunt Gwen O'Connell was unable to attend the meeting between Erickson and members of Petitioner's family that included Petitioner's mother, brother, and sister, at the home of Petitioner's aunt and uncle - Laura and Ed Nelson, (10) Erickson spoke with Gwen on the phone, (11) Erickson was informed Petitioner's uncles Tommy and Johnny O'Connell were unwilling to help, (12) during the meeting Erickson discussed Petitioner's background with Petitioner's family and discussed the video depositions of Petitioner's mother and brother the following day, (13) Petitioner's mother and brother were somewhat problematic witnesses because Petitioner's brother Steve has a diagnosis of mental retardation and the same was suspected of Petitioner's mother, (14) during the meeting, there was no mention of actual physical abuse of Petitioner as a child, (15) Petitioner's relatively advanced age proved an impediment to investigation – Petitioner's father

104

and paternal ancestors were "untraceable" according to Byington and Petitioner's school records were incomplete, (16) at no point during the defense team's investigation did it uncover any evidence of severe physical abuse or sexual abuse, and (17) Byington suggested the defense purposefully build error for an appeal by setting up a claim of ineffective assistance of counsel, a suggestion firmly rejected by attorney Weber who took "especial offense" to the idea.[145]

Investigator Joseph W. Thompson furnish the state habeas court an affidavit stating in pertinent part (1) he obtained all of Petitioner's prison and jail records, (2) he and attorney Erickson visited with Petitioner's family in Long Island, New York to inquire into Petitioner's background, (3) he had previously met with Petitioner's aunt and uncle – Laurie and Ed Nelson – at a pretrial hearing held earlier in the case, (4) he and Erickson explored a wide range of subjects with Petitioner's family during a group discussion, (5) Petitioner's family was cooperative, (6) Petitioner's mother indicated (a) Petitioner never really knew his biological father, who according to Petitioner's mother, raped his own step-sister, (b) Petitioner was raised by his step-father, (c) Petitioner's mother's step-sister made multiple suicide attempts, (d) her family is "dysfunctional and horrible role models," (e) Petitioner was always delinquent in school - she would take him to school and let him out and he would walk in one door and out another on the other side of the school, (f) Petitioner once threw a desk at one of his teachers and has a Jekyll and Hyde personality, (g) Petitioner has no sense of concentration, and (h) Petitioner was drinking, smoking, and playing cards by age 5-7, (7) Petitioner's brother appeared to be stable but was obviously not quite right, and (8) Petitioner's sister (a) said Petitioner saw the way Steve was taunted for his retardation and avoided going in for evaluations, (b) was aware of the

---

[145] SHCR, at pp. 1235-39.

privileges she enjoyed over her brothers, (c) described an incident when Petitioner was seventeen in which he got drunk, ran around in a costume, someone pulled off the costume pants, and Petitioner ran around nude until he was arrested for flashing a police detective's family, (d) described an incident in which a teenage Petitioner held a girlfriend hostage over a dispute over a set of keys, (e) said Petitioner was broken-hearted after his teenage girlfriend had an abortion, (f) said after that all of Petitioner's girlfriends were much older than him, (g) Petitioner has three children, one of whom is a girl aged twenty who once accused Petitioner of having sex with her, (h) Petitioner's two sons are ages seventeen and twelve, (i) Petitioner brought a woman, possibly named Glenda, to New York for a visit but they had a fight and she left, (j) after that, the family told Petitioner not to return to New York again, and (k) said she believed there was a "genetic glitch" she had witnessed in Petitioner; Steve, their uncle Tommy, and their grandfather.[146]

The state habeas trial court found (1) defense counsel conducted and completed a thorough investigation into Petitioner's social, medical, academic, and family background, (2) the defense team's mitigation specialist was fired two months prior to trial for refusing to travel to New York to interview Petitioner's family despite defense counsel's offer to absorb the cost of the trip, (3) defense counsel elicited testimony from Petitioner's family that mental illness and alcoholism affected Petitioner's family for many generations, (4) defense counsel elicited testimony from Dr. Rosenstein that Petitioner showed the indicative characteristics of fetal alcohol syndrome, suffered from impaired brain function likely due to in utero exposure to alcohol, had mental and cognitive capabilities similar to someone with mental retardation, (5) defense counsel elicited testimony from Dr. Seay that Petitioner had borderline intellectual

---

[146] SHCR, at pp. 1241-45.

function, (6) defense counsel attempted to humanize Petitioner by eliciting testimony from Petitioner's mother about Petitioner's childhood hobbies and from Petitioner's sister about the assistance Petitioner gave her when her husband was confined to a wheelchair and her daughter was born,  (7) defense counsel pursued a trial strategy focused on persuading the jury Petitioner would not be a future danger if sentenced to life without parole because he had never been a threat to anyone during previous, lengthy incarcerations, (8) Petitioner's state habeas counsel had failed to uncover any new evidence that differed in any substantial way from the evidence collected by Petitioner's trial counsel, and (9) Petitioner failed to substantiate any allegations of sexual abuse by a parish priest.[147]  The state habeas trial court concluded (1) defense counsel developed a reasonable defensive strategy supported by the facts and circumstances of their investigation, (2) defense counsel's investigation into mitigating evidence was reasonable in light of counsel's experience, defensive strategy, the facts of the offense, and the lack of any new significant mitigating presented in the state habeas proceeding, (3) defense counsel's use of expert witnesses at trial was a matter of sound trial strategy and reasonable, (4) counsel need not retain mitigation specialist for the duration of a capital trial, (5) Petitioner failed to demonstrate the existence of any new evidence that differed substantially from the evidence actually presented at the punishment phase of Petitioner's capital murder trial, (6) Petitioner failed to show his trial counsel conducted a less than reasonable mitigation investigation, and (7) Petitioner's trial counsel's performance did not fall below an objective level of

---

[147] SHCR, at pp. 1293-97.

reasonableness.[148]   The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions when it denied Petitioner's first state habeas corpus application.

### 3.   AEDPA Analysis

#### a.   No Deficient Performance

Petitioner presented the state habeas court with voluminous documentation suggesting there was new mitigating evidence which Petitioner's state trial counsel failed to develop and present at trial.  After carefully reviewing the entirety of this voluminous documentation, which appears primarily in the form of exhibits to Petitioner's first state habeas corpus application, this Court independently concludes the performance of Petitioner's trial counsel in investigating and developing mitigating evidence for Petitioner's trial did not fall below an objective level of reasonableness.  As detailed above in Section IX.E.3.b., Petitioner's trial counsel presented a wide variety of potentially mitigating mental health testimony and other documents designed to convince the jury Petitioner, despite the fact he had murdered six people during a cross-country crime spree, would not pose a danger of future acts of criminal violence once inside the Texas prison system. Given the fact Petitioner had a very clean record during his many previous years of incarceration and detention this was an objectively reasonable trial strategy.  Petitioner's trial counsel also presented extensive evidence showing Petitioner's problems with anger management, violence, and criminal behavior could be traced to his alcoholism and ingestion of street drugs, two things Petitioner was unlikely to encounter in large quantities once serving a "life without parole" sentence in the Texas prison system.

---

[148] SHCR, at pp. 1297-99.

The state habeas trial court accurately found the vast majority of Petitioner's "new evidence" was repetitive of, or not substantially different from, the evidence actually presented during Petitioner's trial. While Petitioner's state habeas counsel did furnish the first direct evidence showing Petitioner's mother had abused alcohol while pregnant with Petitioner, as explained above, there was testimony at trial from both Dr. Rosenstein and Dr. Seay suggesting Petitioner's mother was an alcoholic. Furthermore, Dr. Rosenstein's uncontroverted expert testimony concerning Petitioner's distinctive facial features, small stature, low intellectual functioning, diagnoses of psychotic disorder, antisocial behavior, verbal reasoning deficiencies, and lateralized brain dysfunction left little doubt Petitioner suffered from Fetal Alcohol Syndrome/Fetal Alcohol Effects ("FAS/FAE") or a similar condition which caused actual brain damage. Petitioner's trial counsel cannot reasonably be faulted for presenting Dr. Rosenstein's findings and conclusions regarding FAS/FAE in the manner they did so. Additional testimony vilifying Petitioner's mother as an alcoholic who had imbibed alcohol while pregnant with Petitioner could have offended the jury and would have added nothing substantial to Dr. Rosenstein's uncontroverted expert opinions.[149] There was remarkably little disagreement among the mental health experts who testified at Petitioner's trial regarding his mental health diagnoses; rather, they disagreed over what those diagnoses meant for Petitioner's propensity for future violence.

---

[149] Such a tactic could have invited closing argument by the prosecution that Petitioner was attempting to hide behind his mother's apron rather than the victim of a recognized medical condition. No other mental health expert refuted Dr. Rosenstein's conclusions that Petitioner met all criteria for a finding of FAS/FAE.

Petitioner presented the state habeas court with no evidence showing the defense team had any really choice but to proceed to trial without a mitigation specialist after court-appointed mitigation specialist Byington effectively abandoned the defense team on the eve of trial.

Given (1) the evidence from Petitioner's mother and others showing Petitioner's biological father was out of Petitioner's life from age two on and dead at the time of Petitioner's trial and (2) Byington's assertion that Petitioner's father was "untraceable," Petitioner's trial counsel cannot reasonably be faulted for failing to delve further into the history and background of Petitioner's paternal ancestors and relatives as a potential source of mitigating evidence.

The defense team presented evidence showing Petitioner functions in the borderline range for mental retardation, i.e., just above the mentally retarded range and has a mentally retarded brother. Dr. Seay and Dr. Rosenstein both testified about the limitations this imposed upon Petitioner's ability to function independently in society and to make decisions. The state habeas court's conclusion that Petitioner's defense team undertook an objectively reasonable investigation into Petitioner's background is itself objectively reasonable. Petitioner's trial counsel cannot reasonably be faulted for failing to present even more expert testimony describing Petitioner's low intellectual functioning. "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992), *cert. denied*, 510 U.S. 829 (1993).

While Petitioner did present the state habeas court some additional anecdotal information about Petitioner's background, almost all of the truly "new" evidence was double-edged in nature. Petitioner's mother's descriptions to attorney Erickson and investigator Thompson of

110

Petitioner as an "uncontrollable" teenager who had been a constant truant as a child was unlikely to compel sympathy from the jury for Petitioner. Likewise, Petitioner's sister's assertions that Petitioner had once held a girlfriend hostage in a dispute over a set of keys may have given Petitioner's trial counsel pause about having Petitioner's family testify too extensively about Petitioner's past (and inviting a more searching cross-examination) than they received. Instead of attempting to develop Petitioner's life history through family members, Petitioner's trial counsel chose to present the vast majority of their mitigation evidence through the testimony of mitigation experts who were less likely to be subject to effective cross-examination based upon specific instances of violent behavior by Petitioner. There was nothing objectively unreasonable with that approach.

The state habeas court reasonably concluded the scope of the investigation Petitioner's trial counsel undertook was objectively reasonable and the performance of Petitioner's trial counsel in connection with the punishment phase of Petitioner's trial was likewise objectively reasonable. Petitioner has failed to allege any facts in this Court showing the state habeas court's conclusions on that subject were either (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) the product of an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding. For the reasons discussed at length above in Section IX.E.3.b., this Court independently concludes after *de novo* review the performance of Petitioner's trial counsel in investigating Petitioner's background, discovering potentially mitigating evidence, and developing and presenting mitigating evidence did not fall below an objective level of reasonableness.

b.    No Prejudice

Likewise, for the reasons discussed at length above in Sections VIII.E., IX.C.3.b., and IX.E.3.b., this Court independently concludes after *de novo* review there is no reasonable probability that, but for the failure of Petitioner's trial counsel to present any of the evidence or arguments contained in Petitioner's first state habeas corpus application and its accompanying voluminous exhibits, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

4.    Conclusions

This Court concludes after *de novo* review that this complaint of ineffective assistance fails to satisfy either prong of *Strickland* analysis.   The overwhelming majority of the purportedly "new" evidence identified by Petitioner in his first state habeas corpus application and the exhibits attached thereto was repetitive of the evidence actually presented during Petitioner's trial and, therefore, cumulative in nature.   The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's complaints about his trial counsel's failure to adequately investigate Petitioner's background, develop and present potentially mitigating evidence was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding.   Petitioner's seventh claim herein does not warrant federal habeas corpus relief.

G.     Failure to Impeach Stephen Barr

    1.     The Claim Restated

In his eighth claim herein, Petitioner complains, at the guilt-innocence phase of trial, his trial counsel failed to aggressively cross-examine prosecution witness Stephen Barr by (1) confronting Barr with his long list of prior convictions and (2) presenting evidence showing Barr placed a call to Petitioner's uncle asking for money.[150]

    2.     State Court Disposition

Petitioner presented the same basic arguments as his eighth claim for relief in his first state habeas corpus application.[151] Attorney Tom Weber furnished the state habeas court with an affidavit stating in pertinent part (1) he vaguely recalled Petitioner's uncle Ed Nelson telling Weber that Nelson had received a call from someone at the Travis County Jail whom Nelson now believed to be Barr asking him to send money to Petitioner's commissary account so Petitioner could forward it to him, (2) by then, it was too late to attempt to use this information to impeach Barr, (3) even if Nelson had reported the incident to him earlier, he would not have questioned Barr about it because Nelson had not reported Barr had offered to do anything in exchange for the money, and (4) Weber did not wish to ask Barr a question on cross-examination when Weber did not know what Barr would answer.[152] The relevant portion of Weber's affidavit concludes as follows:

---

[150] Amended Petition, at pp. 290-94.

[151] SHCR, at pp. 285-89.

[152] SHCR, at pp. 1222-23.

113

More importantly, the question of Paul Devoe's guilt was never an issue. Paul Devoe told <u>everyone</u> the people he had killed, including his mother, his friends, police officers etc. Paul Devoe would not shut up, and on his phone, and in custody he told numerous people whom he killed. All the physical evidence, including ballistics and DNA evidence, established beyond all doubt that Devoe committed the murder. Once the judge had ruled on the admissibility of all the avalanche of guilty evidence against Devoe, we knew Devoe was going to be convicted and we would have to try to save his life with mitigating evidence, and, evidence of his lack of violent or disruptive behavior in jail and prison, and expert and family testimony in punishment. All the witnesses called by the defense were called in punishment. Then jury returned a guilty verdict in five minutes in guilt innocence phase. Steven [sic] Barr's testimony was just a small pebble in a mountain of evidence by the state of Paul Devoe guilt, and, not a pebble significant of anything. I do not think Nelson's information was given to me in a timely manner to impeach Barr with [sic], and I do not think what Barr said constituted a bribe at all, or was relevant evidence of anything.[153]

The state habeas trial court found (1) Barr was housed with Petitioner for only a few hours, (2) the jury was aware that, when Barr met Petitioner, Barr was incarcerated for failing to pay child support, (3) in the first few minutes of their brief encounter, Petitioner told Barr he had killed six people, (4) this prompted Barr to request that he no longer be housed in the same cell as Petitioner, (5) Barr's request was granted and Petitioner was moved to a different cell, (6) Barr was only one of many witnesses who testified about statements Petitioner made that he had killed six people, (7) the affidavit of Ed Nelson alleges that Nelson was contacted by someone claiming to be Petitioner's cell mate who asked for money, (8) Nelson could not remember the man's name but felt the request for money was an attempt to solicit a bribe, even though the person with whom he spoke did not expressly promise anything in exchange for the money, (9) defense counsel Erickson had no recollection of ever being notified by Nelson of any contact between Nelson and Barr, and (10) defense counsel Weber only vaguely recalled Nelson

---

[153] SHCR, at p. 1223.

mentioning the incident during the punishment phase of trial, well after Barr's testimony.[154]  The state habeas trial court concluded (1) defense counsel's decision not to impeach Barr's trial testimony was reasonable in light of the defensive strategy and strength of the State's case without the use of this witness, (2) Petitioner failed to show defense counsel acted unreasonably in failing to use Barr's criminal history to impeach Barr's credibility when the jury was already aware Barr was in jail for failure to pay child support, (3) there was insufficient evidence to demonstrate Barr was the person who contacted Nelson or that, even if Barr did so, that a bribe was being solicited, (4) Petitioner's complaint fails to satisfy the deficient performance prong of *Strickland*, and (5) Petitioner failed to show the outcome of his trial would have been different had Barr's credibility been directly impeached by defense counsel.[155]  The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions when it denied Petitioner's first state habeas corpus proceeding.

3.    AEDPA Analysis

a.    No Deficient Performance

The state habeas court reasonably concluded the failure of Petitioner's trial court to impeach Stephen Barr with evidence of Barr's prior convictions was objectively reasonable.  The jury was already aware Barr was serving a term for failing to pay child support.  During his very brief trial testimony, Barr managed to quote Petitioner as having said "I killed six people," more than a half dozen times.[156]  Petitioner's trial counsel could reasonably have concluded keeping

---

[154] SHCR, at pp. 1299-1301.

[155] SHCR, at pp. 1301-03.

[156] Testimony of Stephen Barr, RR Vol. 23, at pp. 39, 41, 48- 49, 56-58.

Barr on the stand just to list all of his prior convictions was unlikely to prove productive. "The law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009).

Given the lack of evidence showing either of Petitioner's trial counsel were ever made aware of the alleged contact between Barr and Nelson until the punishment phase of trial, Petitioner's trial counsel cannot reasonably be faulted for failing to attempt to impeach Barr based upon a request for money made to Nelson by someone who may or may not have been Barr which request was not communicated to counsel until long after Barr was excused as a witness, especially when there was no evidence the request for funds was accompanied by any express offer to do anything in exchange for receipt of the funds. Finally, as attorney Weber pointed out succinctly, it is never a good idea for an attorney to ask a question of a hostile witness on cross-examination unless the attorney is certain of the answer.

      b.    <u>No Prejudice</u>

By the time Barr testified at the guilt-innocence phase of Petitioner's trial, there was no doubt as to Petitioner's guilt. The uncontroverted ballistics evidence identified the handgun found in Petitioner's possession upon his arrest in New York as the weapon used in all six murders.[157] Barr testified after the eyewitnesses to Petitioner's fatal shooting of Michael Allred had all testified[158] and after Bill Brinlee explained to the jury that Petitioner called him the night of the murders at Paula Griffith's house and told him (1) he had shot four people, maybe killed two, and was on the run and (2) he went to the bar to kill Glenda and was now going after her

---

[157] Testimony of Tim Counce, RR Vol. 24, at pp. 70-131.

[158] Testimony of Glenda Purcell, RR Vol. 21, at pp. 215-44; Testimony of Barbara Phillips, RR Vol. 21, at pp. 246-67; Testimony of Henry Joe Bray, RR Vol. 22, at pp. 7-24.

and her father.[159]   The state habeas court reasonably concluded Petitioner was not prejudiced at the guilt-innocence phase of trial by his trial counsel's failure to aggressively attempt to impeach Barr with all of Barr's prior convictions or the incident involving Nelson.

4.   Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's ineffective assistance claim premised upon Petitioner's trial counsel's failure to aggressively impeach Barr at the guilt-innocence phase of trial with evidence of Bar's prior convictions and the incident involving Nelson was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's first state habeas corpus proceeding.   Under *de novo* review, this Court concludes Petitioner's eighth claim herein fails to satisfy either prong of *Strickland* analysis.   Petitioner's eighth claim herein does not warrant federal habeas relief.

**X. Ineffective Assistance By State Appellate Counsel**

A.   The Claim

As part of his sixth claim herein, Petitioner argues his state appellate counsel rendered ineffective assistance by failing to raise a point of error on direct appeal asserting the state trial court erred in admitting the testimony of Dr. Coons' on "life without parole" inmates.[160]

---

[159] Testimony of Bill Brinlee, RR Vol. 21, at pp. 107-09, 112, 121.
[160] Amended Petition, at p. 105.

117

B.    Clearly Established Federal Law

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013) ("A criminal defendant has a constitutional right to receive effective assistance of counsel on his first appeal.   In a direct appeal, ineffective assistance of counsel claims are governed by the standard established by the Supreme Court in *Strickland v. Washington."(Footnotes omitted))*, *cert. denied*, 134 S. Ct. 1292 (2014); *Higgins v. Cain*, 720 F.3d 255, 261 n.8 (5th Cir.) ("The *Strickland* standard is used to evaluate claims for ineffective assistance of appellate counsel."), *cert. denied*, 134 S. Ct. 688 (2013).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U.S. at 285; *Higgins v. Cain*, 720 F.3d at 260-61.   Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize

the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. at 288; *Jones v. Barnes*, 463 U.S. 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, 463 U.S. at 751-52.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004) (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful), *cert. denied*, 541 U.S. 1987 (2004); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (holding the same); *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation), *cert. denied*, 540 U.S. 1154 (2004). Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart*, 357 F.3d at 525; *Schaetzle v. Cockrell*, 343 F.3d at 445.

Where, as in Petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 & 482 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89 (holding petitioner who argued his appellate counsel rendered ineffective assistance by

119

failing to file a merits brief must satisfy both prongs of *Strickland*); *Busby v. Dretke*, 359 F.3d at 714-17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

C.    *De Novo* Review

The state habeas court held that Dr. Coons' trial testimony about the motivation (or lack thereof) of "life without parole" inmates to comply with prison rules and behave was relevant and admissible.[161]    That state evidentiary ruling binds this Court in federal habeas review. *Bradshaw v. Richey*, 546 U.S. at 76; *Garza v. Stephens*, 738 F.3d at 677.    Thus, there was nothing objectively unreasonable with the failure of Petitioner's trial counsel to challenge the admission of the testimony in question.    Counsel is not required to make futile objections or motions. *Miller v. Thaler*, 714 F.3d at 904 n.6; *Roberts v. Thaler*, 681 F.3d at 612.    Furthermore, because the testimony was "relevant and material" and there was no contemporaneous objection to the testimony in question, there is no reasonable probability the outcome of Petitioner's direct appeal would have been any different had Petitioner's state appellate counsel raised what would in all likelihood have been a procedurally defaulted point of error complaining about the admission of the testimony in question. Finally, for the same reasons discussed above in Section V.D., any error in the admission of this aspect of Dr. Coons' testimony was likely insufficient to satisfy the "materiality" test under Texas law. *See Ex Parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014) ("Only the use of *material* false testimony amounts to a due-process violation.    And false testimony is *material* only if there is a 'reasonable likelihood' that it affected the judgment of the jury.").    There is no reasonable probability the outcome of

---

[161] SHCR, at pp. 1291-92.

Petitioner's appeal would have been any different had his state appellate counsel included a point of error complaining about the admission of Dr. Coons' opinion concerning the low motivations of "life without parole" inmates to behave in prison.

## D.      Conclusions

The failure of Petitioner's state appellate counsel to include a point of error complaining about the admission of Dr. Coons' opinion testimony regarding the motivations of "life without parole" inmates did not cause the performance of said counsel to fall below an objective level of reasonableness and did not "prejudice" Petitioner within the meaning of *Strickland*.   After *de novo* review, this Court concludes this portion of Petitioner's sixth claim herein does not satisfy either prong of *Strickland* analysis and does not warrant federal habeas corpus relief.

## XI. <u>"Ineffective Assistance" by State Habeas Counsel</u>

## A.      The Claims

In his tenth and eleventh claims herein, Petitioner argues his state habeas counsel rendered ineffective assistance under the standard announced in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), by failing to (1) raise a claim during Petitioner's first state habeas corpus proceeding that Petitioner was incompetent to assist state habeas counsel (and therefore entitled to an indefinite stay of all state habeas proceedings) and (2) thoroughly investigate and present a claim suggesting Petitioner's trial counsel failed to adequately investigate Petitioner's background and present all available mitigating evidence.[162]

---

[162] Amended Petition, at pp. 311-20.

B.     State Court Disposition

Petitioner presented the same claims as part of his second application for state habeas corpus relief, which the Texas Court of Criminal Appeals summarily dismissed based upon Texas writ-abuse principles. *Ex parte Paul Gilbert Devoe*, 2016 WL 157980, at *1.

C.     Procedural Default

The Texas Court of Criminal Appeals' summary dismissal of these two claims in the course of Petitioner's second state habeas corpus proceeding pursuant to the Texas abuse of the writ standard bars federal habeas review of those claims. *See Canales v. Stephens*, 765 F.3d at 566 ("the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar." (quoting *Hughes v. Quarterman*, 530 F.3d at 342)); *Reed v. Stephens*, 739 F.3d at 766 (holding the same); *Cotton v. Cockrell*, 343 F.3d at 755 (holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review).

D.     Alternatively, No Merit

1.     Defects in State Habeas Proceedings Not a Basis for Federal Habeas Relief

Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas corpus relief. *Henderson v. Stephens*, 791 F.3d at 578; *Ladd v. Stephens*, 748 F.3d at 644; *Tercero v. Stephens*, 738 F.3d at 147. This rule also applies to assertions of deficient performance by counsel during state habeas corpus proceedings. *See Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) ("Ineffectiveness of post-conviction counsel cannot be the grounds for

federal habeas relief."), *cert. denied*, 563 U.S. 919 (2011); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (alleged deficiencies in the performance of state habeas counsel do not furnish a basis for federal habeas corpus relief); 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

 2. *Martinez & Trevino* Inapplicable

 Contrary to the premise underlying Petitioner's tenth and eleventh claims herein, the Supreme Court's holding in *Martinez v. Ryan*, 566 U.S. 1 (2012), did not create a new freestanding theory of federal habeas corpus relief for federal habeas petitioners whose state habeas counsel allegedly failed to adequately develop or raise a claim in a state habeas proceeding. *See In re Sepulvado*, 707 F.3d 550, 554 (5th Cir.) ("To the extent that Sepulvado relies on a supposed constitutional right to the effective assistance of post-conviction counsel, he misapprehends the holding and import of *Martinez*, which did not alter our rule that 'the Sixth Amendment does not apply in habeas proceedings.'"), *cert. denied*, 134 S. Ct. 420 (2013); *Adams v. Thaler*, 679 F.3d 312, 316 (5th Cir. 2012) ("The Court characterized its decision [in *Martinez*] as an "equitable ruling," and not a constitutional ruling."), *stay of execution denied*, 132 S. Ct. 1995 (2012).

 Instead, the holding in *Martinez* carved out of the Supreme Court's procedural default jurisprudence a narrow exception for *claims of ineffective assistance by trial counsel* which were not raised in a convicted criminal defendant's state habeas corpus proceeding because of the ineffective assistance of the defendant's state habeas counsel. *See Martinez v. Ryan*, 566 U.S. at ___, 132 S. Ct. at 1315 ("Inadequate assistance of counsel at initial review collateral proceedings

may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial).  In *Trevino v. Thaler*, 133 S. Ct. 1911, 1912 (2013), the Supreme Court reaffirmed the narrow focus of its holding in *Martinez*: "In *Martinez v. Ryan*, 566 U.S. 1, __, 132 S. Ct. 1309, 1320, 182 L. Ed. 2d 272, this Court held that 'a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'"  *Martinez* did not create a new federal constitutional right to the assistance of effective state habeas counsel for all types of claims.

Petitioner's tenth and eleventh claims herein do not present complaints of ineffective assistance by Petitioner's *trial* counsel that were foreclosed from state habeas review by virtue of the ineffective assistance of Petitioner's state habeas counsel.  On the contrary, Petitioner's tenth and eleventh claims herein seek federal habeas corpus relief based solely upon alleged deficiencies in the performance of Petitioner's *state habeas* counsel.  Insofar as Petitioner relies upon *Martinez* and *Trevino* to challenge the performance of his *state habeas* counsel, his efforts are non sequitur.  *See Segundo v. Davis*, ___ F.3d ___, ___, 2016 WL 4056397, *2 (5th Cir. July 28, 2016) ("Under *Martinez*, habeas petitioners may attempt to show cause for default by demonstrating the ineffectiveness of state habeas counsel in failing to raise a substantial ineffective-assistance-of-trial-counsel ('IATC') claim."); *Norman v. Stephens*, 817 F.3d 226, 232 (5th Cir. 2016) (holding a petitioner attempting to rely upon *Martinez* to circumvent a procedural default must show both (1) appointed counsel in the initial review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* and (2) the underlying claim of ineffective assistance by *trial* counsel is substantial, which is to say the

124

prisoner must demonstrate the claim has some merit); *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014) ("To succeed in establishing cause under *Trevino* and *Martinez*, the petitioner must show: (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application.), *cert. denied*, 135 S. Ct. 2312 (2015).

      3.    <u>No State Procedural Default on Petitioner's *Wiggins* Claim</u>

Insofar as Petitioner attempts to employ *Martinez* and *Trevino* to his *Wiggins* complaint about the performance of his trial counsel in investigating, developing, and presenting potentially mitigating evidence, that effort likewise fails to recognize (1) the nature of the narrow procedural holdings in *Martinez* and *Trevino* and (2) the fact Petitioner fully litigated and obtained a ruling on the merits of his *Wiggins* claim during his first state habeas corpus proceeding. In his seventh claim for relief in Petitioner's first state habeas corpus application, Petitioner's initial state habeas counsel presented a fully developed claim of ineffective assistance by Petitioner's trial counsel described in detail in one hundred and fifty pages of that pleading[163] and supported by more than forty exhibits filling several hundred pages in the state habeas record. Among the exhibits supporting Petitioner's *Wiggins* claim were (1) an affidavit from social worker Mary Burdette,[164] (2) a report on a psychological evaluation of Petitioner performed by Dr. Rebecca Hamlin,[165] (3) an affidavit from Petitioner's half-sister Elizabeth Petrie,[166] (4) three affidavits

---

[163] SHCR, at pp. 134-284.

[164] SHCR, at pp. 303-05.

[165] SHCR, at pp. 307-17.

[166] SHCR, at pp. 597-603.

from Petitioner's mother,[167] (5) an affidavit from Petitioner's aunt Laura O'Connell Nelson,[168] (6) an affidavit from Petitioner's aunt Dorothy O'Connell Bene,[169] (7) a detailed chronology of Petitioner's life by Mary Burdette which filled seventy-six pages,[170] (8) an affidavit from psychologist Dr. Paula Lundberg Love addressing the pharmacological aspects of Petitioner's addictions to alcohol and drugs,[171] and (9) an affidavit from Dr. Leslie Rosenstein addressing Petitioner's exposure to alcohol in utero and resulting FAD/FAE.[172] The state habeas trial court made extensive findings of fact and conclusions of law specifically addressing the merits of Petitioner's seventh claim for state habeas relief in Petitioner's first state habeas proceeding.[173] The Texas Court of Criminal Appeals adopted those findings and conclusions when it denied Petitioner's first state habeas corpus application. Petitioner's assertion in his federal habeas corpus pleadings that there was a procedural default on any portion of his seventh claim for state habeas corpus relief is factually inaccurate. Thus, the factual premise underlying Petitioner's eleventh claim herein is false.

*Martinez* and *Trevino* address an exception to the Supreme Court's procedural default jurisprudence where an underlying claim relates exclusively to the performance of the

---

[167] SHCR, at pp. 676-77, 679-83, 685-86.

[168] SHCR, at pp. 701-09.

[169] SHCR, at pp. 711-15.

[170] SHCR, at pp. 717-93.

[171] SHCR, at pp. 801-15.

[172] SHCR, at pp. 837-43.

[173] SHCR, at pp. 1293-99. The state habeas trial court made no findings or conclusions suggesting Petitioner had procedurally defaulted on his seventh claim for relief or otherwise failing to address the merits of Petitioner's *Wiggins* claim under the *Strickland* standard.

Petitioner's state trial counsel. Those rulings do not apply to claims of ineffective assistance by state trial counsel which were fully litigated and decided on the merits during a state habeas corpus proceeding. *See Escamilla v. Stephens*, 749 F.3d 380, 394 (5th Cir. 2014) ("*Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted."). Thus, Petitioner's eleventh claim herein does not furnish a basis for federal habeas corpus relief.[174]

### 4.   The Performance of State Habeas Counsel

Likewise, insofar as Petitioner faults the performance of his state habeas counsel for failing to raise a claim in Petitioner's first state habeas corpus proceeding premised upon Petitioner's purported incompetence to assist state habeas counsel during that proceeding, that complaint lacks any arguable merit. Texas law does not recognize a right to competence during a state habeas corpus proceeding. *See Ex parte Mines*, 26 S.W.3d 910, 911-16 (Tex. Crim. App. 2000) (neither the Texas Constitution nor Texas statutes require a death row inmate be competent during the pendency of a state habeas corpus proceeding challenging the inmate's conviction or sentence), *cert. denied*, 532 U.S. 908 (2001). Petitioner's initial state habeas counsel cannot reasonably be faulted for failing to raise a futile or meritless claim in Petitioner's first state habeas corpus proceeding.

---

[174] Moreover, Petitioner's Amended Petition in this Court identifies no deficiencies in the performance of Petitioner's first state habeas counsel vis-à-vis Petitioner's seventh claim for state habeas corpus relief. Petitioner does not allege any facts showing there was any additional "new" evidence Petitioner's first state habeas counsel could or should have discovered and presented to the state habeas court. Nor does Petitioner identify for this Court any facts showing Petitioner was prejudiced during the course of his first state habeas proceeding by anything his first state habeas counsel did or failed to do in connection with Petitioner's fully litigated seventh claim for state habeas relief. Conclusory assertions of deficient performance by trial counsel or prejudice such as those contained in Petitioner's pleading in this Court in support of his tenth and eleventh claims herein are insufficient to support a claim for ineffective assistance of counsel. *Woodfox v. Cain*, 609 F.3d 774, 809 n.17 (5th Cir. 2010); *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir.), *cert. denied*, 562 U.S. 911 (2010); *Day v. Quarterman*, 566 F.3d 527, 540 (5th Cir. 2009).

Petitioner's complaints about the performance of his initial state habeas counsel vis-à-vis Petitioner's *Wiggins* claim presented in Petitioner's first state habeas proceeding also fail to satisfy the dual prongs of *Strickland* analysis. Petitioner's initial state habeas counsel fairly presented the state habeas court with a detailed *Wiggins* claim and a variety of other ineffective assistance claims, all of which Petitioner continues to litigate in this very federal habeas corpus proceeding. Petitioner's initial state habeas counsel presented the state habeas court with a wealth of evidence supporting his ineffective assistance claims, including his *Wiggins* claim. After carefully reviewing all of the voluminous documents accompanying Petitioner's first state habeas corpus application, this Court concludes those documents contain no significant or substantial information helpful to Petitioner which was not presented during Petitioner's trial through the testimony of either Dr. Rosenstein, Dr. Seay, or Dr. Cantu. The state habeas court reasonably concluded Petitioner's *Wiggins* claim failed to satisfy either prong of *Strickland* analysis.

Petitioner has failed to demonstrate there was anything objectively unreasonable with the performance of his initial state habeas counsel vis-a-vis Petitioner's ineffective assistance claims. Petitioner has also failed to establish there was any additional evidence available at the time of his first state habeas corpus proceeding which, in all reasonable likelihood, would have altered the outcome of his initial state habeas corpus proceeding. There is no reasonable probability the new testimony of Petitioner's mother, sister, and aunt furnished to the state habeas court in affidavits dated after Petitioner's trial concluded showing (1) additional acts of kindness by Petitioner to his family members, (2) the bad nature of Petitioner's biological father and paternal relatives, or (3) Petitioner's mother drank extensively during her pregnancy with Petitioner

128

would have resulted in a different outcome in Petitioner's trial had Petitioner's trial counsel presented such evidence. Dr. Rosenstein insisted Petitioner met all criteria for FAS/FAE. No other expert contradicted that diagnosis.

E.    Conclusions

Petitioner procedurally defaulted on his tenth and eleventh claims herein. Alternatively, following *de novo* review, this Court concludes Petitioner's tenth and eleventh claims herein do not furnish an arguable basis for federal habeas corpus relief.

## XII. Request for Evidentiary Hearing

Petitioner has requested an evidentiary hearing to permit more factual development of his claims herein. Under the AEDPA, the proper place for development of the facts supporting a claim is the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court), *cert. denied*, 522 U.S. 984 (1997). Furthermore, where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U.S. 170  181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.

Thus, Petitioner is not entitled to a federal evidentiary hearing on any of his claims herein which were rejected on the merits by the state courts, either on direct appeal or during Petitioner's state

129

habeas corpus proceeding. *See Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) ("The Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance."), *cert. denied*, 136 S. Ct. 38 (2015).  Likewise, where a federal habeas corpus petitioner's claims lack merit on their face, further factual development is not necessitated. *See Register v. Thaler*, 681 F.3d 623, 627-30 (5th Cir. 2012) (recognizing District Courts possess discretion regarding whether to allow factual development, especially when confronted with claims foreclosed by applicable legal authority).

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro v. Landrigan*, 550 U.S.465, 468, 127 S. Ct. 1933, 1937, 167 L. Ed. 2d 836 (2007)).  "In determining whether to grant a hearing, under Rule 8(a) of the Habeas Court Rules 'the judge must review the answer [and] any transcripts and records of state-court proceedings... to determine whether an evidentiary hearing is warranted.' " *Richards v.* Quarterman, 566 F.3d at 562-63 (*quoting Hall v. Quarterman*, 534 F.3d 365, 368 (5th Cir.2008) (*in turn quoting Schriro*, 550 U.S. at 473)).  In making this determination, courts must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Richards v. Quarterman*, 566 F.3d at 563 (*quoting Schriro*, 550 U.S. at 474).

Petitioner's first through eighth, twelfth, and thirteenth claims herein were rejected on the merits during his state direct appeal or initial state habeas corpus proceedings.  Under *Pinhlsoter*,

he is not entitled to further evidentiary or factual develop of those claims. Petitioner's ninth through eleventh claims are without arguable legal merit as a matter of law and do not require factual or evidentiary development. In addition to being without merit, Petitioner's tenth and eleventh claims are procedurally defaulted. Petitioner's ineffective assistance claims attacking the performance of his state appellate counsel and state habeas counsel are not "substantial" for purposes of the *Ryan v. Martinez* exception to the procedural doctrine. Petitioner is not entitled to an evidentiary hearing for the purpose of developing any of his claims herein. *See Segundo v. Davis.* ___ F.3d at ___, 2016 WL 4056397, at *4 ("Given the extent of the factual development during trial and during the state habeas proceedings, the district court did not abuse its discretion in determining it had sufficient evidence and declining to hold a hearing."). Petitioner fully developed all his non-frivolous claims during his direct appeal or first state habeas corpus proceeding, in which those claims here denied on the merits. He is not entitled to an evidentiary hearing before this Court.

## XIII. Certificate of Appealability

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a certificate of appealability (CoA). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. §2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted

or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; 28 U.S.C. §2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See*

*Slack v. McDaniel*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, 558 U.S. 993 (2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006). Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El v. Cockrell*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course.").

The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Ward v. Stephens*, 777 F.3d 250, 259 (5th Cir.), *cert. denied*, 136 S. Ct. 86 (2015).

Reasonable minds could not disagree with this Court's conclusions that (1) all of Petitioner's complaints about the performance of his trial counsel fail to satisfy the prejudice prong of *Strickland*, (2) the state habeas court reasonably concluded all of Petitioner's claims of ineffective assistance by his state trial counsel fail to satisfy the deficient performance prong of *Strickland* analysis, (3) Petitioner's complaint about the performance of his state appellate

counsel fails to satisfy either prong of *Strickland* analysis, (4) Petitioner's complaints about the performance of his state habeas counsel do not furnish an independent basis for federal habeas corpus relief, (5) Petitioner's complaint that he is currently incompetent does not furnish a basis for a stay of these proceedings, (6) Petitioner's claim that he was incompetent during his first state habeas corpus proceeding does not furnish a basis for federal habeas corpus relief, (7) the state appellate and state habeas courts reasonably rejected Petitioner's first, third, fifth, twelfth, and thirteenth claims herein on the merits, (8) Petitioner procedurally defaulted on his challenges to the admissibility of Dr. Coons' opinion testimony by failing to timely object to same, (9) Petitioner's complaints about Dr. Coons' opinion testimony do not furnish a basis for federal habeas relief, (10) nothing in the trial testimony of A.P. Merillat was factually inaccurate, false, or misleading, (11) Petitioner's religion-based *Batson* claim is foreclosed by the non-retroactivity doctrine of Teague, and (12) Petitioner is not entitled to a federal evidentiary hearing.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in Petitioner's amended federal habeas corpus petition, filed March 13, 2015 (ECF no. 22), is **DENIED**.

2. Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3. Petitioner's request for a federal evidentiary hearing is **DENIED**.

SIGNED this __26__ day of September, 2016.

_Sam Sparks_

**SAM SPARKS**
**UNITED STATES DISTRICT JUDGE**

134